301 S.E.2d 563

**Curtis ROBERTSON, et al.**

v.

**Tony K. LeMASTER, et al., and N & W Railway Co.**

**No. 15543.**

Supreme Court of Appeals of West Virginia.

March 24, 1983.

Kenneth H. Fisher, Huntington, for appellants.

James D. McQueen, Jr., Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, for appellees.

McGRAW, Chief Justice:

This is an appeal by Curtis and Karen Lee Robertson from an order entered by the Circuit Court of Wayne County granting the motion of Norfolk & Western Railway Company for a directed verdict, and dismissing the appellants' action on the merits. The appellants' civil action sought to hold liable Tony K. LeMaster, his mother, Arthonia, and the Norfolk & Western Railway Company for damages resulting from an automobile accident that occurred on October 12, 1978. The appellants' claim against Tony and Arthonia LeMaster was compromised and settled prior to trial. Consequently, the action proceeded solely against the appellee, Norfolk & Western Railway Company.

The evidence adduced by the appellants at trial showed that on October 11, 1978, Tony K. LeMaster, then nineteen years old, was employed by the appellee as a section laborer. LeMaster reported for work at 7:00 a.m. at the appellee's Nolan section office, approximately 50 miles from his home in Fort Gay. After working three hours in the Nolan area, LeMaster's section was called in to work at a derailment that had occurred near Kermit, approximately half-way between the appellee's section office in Nolan and LeMaster's home in Fort Gay. LeMaster and his fellow workers were transported to the derailment site in a truck owned by the appellee.

Upon arriving at the derailment site, the section foreman, Ruben VanHoose, instructed his men to eat lunch. When they finished eating, the section crew began the work of removing debris and repairing the track that was damaged by the derailment. The derailment had completely blocked the appellee's single railway track between Fort Gay and Nolan, and thus was deemed an emergency under the railroad's contract with its union employees. Much of the work of removing the derailed train and the damaged track was performed by heavy equipment furnished by the appellee. However, the work performed by LeMaster and his co-workers was heavy manual labor which included lifting railroad ties and shoveling coal. The work was continuous, except for intermittent periods when the workers were required to step back out of the way of the heavy equipment. The work continued long past LeMaster's normal 3:30 p.m. quitting time.

At approximately 10:00 p.m. that night, LeMaster told his foreman, VanHoose, that he was tired and wanted to go home. VanHoose told LeMaster that he could not go home, but told him to speak with Bill Rowe,

the road master in charge. LeMaster did not speak with Rowe at this time, but continued working.

At approximately 1:00 a.m. on the morning of October 12, 1978, LeMaster was given his first chance to eat since lunch the previous day. LeMaster ate in a dining car provided by the appellee. When he was finished eating, LeMaster left the dining car and sat down outside to rest. LeMaster testified that this was his first opportunity to rest since beginning work on the derailment. After sitting down, LeMaster was approached by Rowe and told to return to work.

LeMaster resumed working. Several times during the night he told his foreman that he was tired and wanted to go home. Each time the foreman told LeMaster that he should ask Rowe. LeMaster testified that he did not speak with Rowe for fear of being fired. Apparently, LeMaster and Rowe were involved in a work related dispute several months before, which resulted in LeMaster being laid off for a week. At 5:00 a.m. LeMaster ate breakfast in the dining car. After breakfast he again resumed work.

At 9:00 a.m. or 9:30 a.m. LeMaster talked with Les Conn, the assistant foreman, about going home. Shortly thereafter, LeMaster told VanHoose that he was too tired to work, and VanHoose then told him to talk with Rowe. LeMaster finally spoke with Rowe, telling him that he was too tired to continue working. Rowe told LeMaster that if he wouldn't work, he should get his bucket and go home. LeMaster asked for a ride to his car in Nolan.

An employee of the appellee drove LeMaster to his car. During the drive from the derailment site to Nolan, LeMaster fell asleep with a lighted cigarette in his hand. Upon arriving at Nolan, LeMaster got into his car and began the 50 mile trip to his house in Fort Gay. He decided to stop en route at the derailment site at Kermit to speak with Rowe and determine if he had been fired. When he arrived at the derailment site, LeMaster threw his hard hat at Rowe, told him to find some other person to work, and then asked if he was fired.

Rowe told LeMaster that he was not fired and to "just go on home." They then shook hands, and LeMaster left in his car.

On the way home LeMaster claims that he fell asleep at the wheel and the accident with the Robertsons resulted. LeMaster has no memory of the details of the accident. Benjamin Jude, a witness to the accident, testified that he was travelling from Kermit to Louisa at approximately 10:45 a.m. when LeMaster passed his car. Jude was travelling 65 to 70 miles per hour at the time. He estimated that LeMaster was travelling about 75 miles per hour. Jude testified that LeMaster turned his head and looked at him when he passed, and that LeMaster appeared normal and his eyes were open.

After passing Jude's vehicle, LeMaster came upon the appellants' vehicle travelling in the same direction as LeMaster, but at a much slower speed. Jude testified that it appeared that LeMaster was attempting to pass the appellants' vehicle when the right front end of LeMaster's car struck the left rear end of the appellants' car, causing the accident. After the accident, Jude approached LeMaster's car to see if he was injured. Jude testified that it took approximately a minute for LeMaster to regain consciousness. LeMaster told Jude that he was "all right except I must have fallen asleep."

The section crew of which LeMaster was a member had worked throughout the night without rest breaks. Some of the men did slip away and go to sleep. One member of the section crew blacked out, fell over an embankment and slept for approximately an hour. LeMaster worked approximately 27 hours before Rowe gave him permission to quit work. The section crew, other than LeMaster, worked for 37 hours on the derailment. The appellee railroad company offered to drive all members of the crew, other than LeMaster, to their homes, rather than taking them back to Nolan to their vehicles.

The appellants' cause of action sounds in tort. They allege in their complaint that the appellee, Norfolk & Western Railway Company, "illegally, willfully, wantonly,

negligently, and with a conscious disregard for the rights and safety of others, ordered, forced and required ... LeMaster, its employee, to work for ... 32 hours straight without rest, and then to leave the ... place of employment without providing either rest or transportation home when it knew or should have known that its employee constituted a menace to the health and safety of the public." The appellants further allege that these acts of the appellee were the proximate cause of the automobile accident in which they were injured.

At the close of the plaintiff's case, the appellee moved for a directed verdict on the issue of liability. As grounds for the motion the appellee asserted that the appellants had made no factual showing to demonstrate that a duty of care existed on the part of the appellee towards the appellants, or to demonstrate that the conduct of the appellee was the proximate cause of the accident. The trial court agreed that the elements of duty and proximate cause had not been established, and granted the appellee's motion. We reverse.

I.

"In order to establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken." Syllabus Point 1, *Parsley v. General Motors Acceptance Corporation,* 167 W.Va. 866, 280 S.E.2d 703 (1981). *See Hinkle v. Martin,* 163 W.Va. 482, 256 S.E.2d 768 (1979); *Morrison v. Roush,* 110 W.Va. 398, 158 S.E. 514 (1931); *Uthermohlen v. Bogg's Run Min. & Mfg. Co.,* 50 W.Va. 457, 40 S.E. 410 (1901). The appellee contends that it owed no duty of care to the appellants, and therefore the trial court correctly directed a verdict against the appellants. We disagree.

Throughout the history of Anglo-American jurisprudence the concept of duty in tort law has evolved in response to the social aims of civilized society. When tort law first emerged as a separate legal entity from criminal law, the duty existed to act with care towards all others. *See* W. Pros-

ser, *The Law of Torts supra* §§ 4, 53 (4th ed. 1971); Note, *The Death of Palsgraf: A Comment on the Current Status of the Duty Concept in California,* 16 San Diego L.Rev. 793, 794 (1979). During the industrial revolution of the nineteenth century, this broad concept of duty was transformed by courts into a device by which the liability of defendants could be limited. *See* W. Prosser, *supra* § 53; Note, *The Origin of the Modern Standard of Due Care in Negligence,* 1976 Wash.U.L.Q. 447; Sulnick, *A Political Perspective of Tort Law,* 7 Loy.L.A.L.Rev. 410 (1974); Green, *The Thrust of Tort Law Part I The Influence of Environment,* 64 W.Va.L.Rev. 1 (1961). With the advent of the twentieth century, however, this pro-defendant bias has steadily eroded, and the emphasis on duty has been shifted towards the goal of compensating victims of tortious conduct. *See* Hodel, *The Modern Concept of Duty: Hoyem v. Manhattan Beach City School District and School District Liability for Injuries to Truants,* 30 Hastings L.J. 1893, 1906 (1979); Fleming, *The Role of Negligence in Modern Tort Law,* 53 Va.L.Rev. 815 (1967).

The California Supreme Court has been the vanguard of the modern trend to expand the concept of duty in tort cases. In two landmark cases, *Dillon v. Legg,* 68 Cal.2d 728, 441 P.2d 912, 69 Cal.Rptr. 72 (1968), and *Rowland v. Christian,* 69 Cal.2d 108, 443 P.2d 561, 70 Cal.Rptr. 97 (1968), the California Court retreated from the concept of duty as a means of limiting the defendant's liability and returned to the fundamental tort law principle, stated in *Heavener v. Pender,* [1883] 11 Q.B.D. 503, that all persons are required to use reasonable care to prevent others from being injured as a result of their conduct. *See* Murphy, *Evolution of the Duty of Care: Some Thoughts,* 30 DePaul L.Rev. 147, 164–168 (1980); Note, *The Death of Palsgraf: A Comment on the Current Status of the Duty Concept in California, supra.*

In West Virginia, our counterpart to this principle is stated in syllabus point eight of *Blaine v. Chesapeake & O.R.R. Co.,* 9 W.Va. 252 (1876): "The liability to

make reparation for an injury, by negligence, is founded upon an original moral duty, enjoined upon every person, so to conduct himself, or exercise his own rights, as not to injur another." This basic expression of policy is a restatement of the general duty which all actors in an organized society owe to their fellow persons. However, in order to form the basis for a valid cause of action, this duty must be brought home to the particular plaintiff, for "a duty owing to everybody can never become the foundation of an action until some individual is placed in position which gives him particular occasion to insist upon its performance ..." T. Cooley, *Law of Torts* § 478 (4th ed. 1932).[1]

The appellee argues that as a matter of law it owed no duty to control an employee acting outside the scope of employment. We recognize that under traditional principles of master-servant law an employer is normally under no duty to control the conduct of an employee acting outside the scope of his employment. *See Restatement (Second) of Torts* § 317 (1965); *Annot.*, 52 A.L.R.2d 287 (1957). The issue presented by the facts of this case, however, is not the appellee's failure to control LeMaster while driving on the highway; rather it is whether the appellee's conduct prior to the accident created a foreseeable risk of harm.

■ It is well established that one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm. *See Restatement (Second) Torts* § 321 (1965). As Professor Prosser succinctly states: " '[Duty]' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in

light of the apparent risk." W. Prosser, *supra* § 53. The issue raised by the appellants is whether the appellee's conduct in requiring LeMaster to work over 27 hours and then setting him loose upon the highway without providing alternate transportation or rest facilities to its exhausted employee created an unreasonable risk of harm to others that was foreseeable. The appellants contend that the appellee's conduct amounts to primary negligence; they do not rely on the doctrine of *respondeat superior.*

■ In determining the scope of the duty which an actor owes to another, the court in *Dillon v. Legg, supra,* focused on the foreseeability of injury. A significant number of courts have since followed this approach. *See Keck v. Jackson,* 122 Ariz. 117, 593 P.2d 671 (1978); *D'Amicol v. Alvarez Shipping Co., Inc.,* 31 Conn.Sup. 164, 326 A.2d 129 (1973); *Kelley v. Kokua Sales and Supply Ltd.,* 56 Haw. 204, 532 P.2d 673 (Haw.1975); *Rickey v. Chicago Transit Authority,* 101 Ill.App.3d 439, 57 Ill.Dec. 46, 428 N.E.2d 596 (1981); *Barnhill v. Davis,* 300 N.W.2d 104 (Iowa 1981); *Culbert v. Sampson's Supermarkets, Inc.,* Me., 444 A.2d 433 (1982); *Dziokonski v. Babineau,* 375 Mass. 555, 380 N.E.2d 1295 (Mass.1978); *Okrina v. Mideastern Corp.,* 282 Minn. 400, 165 N.W.2d 259 (Minn.1969); *Corso v. Merrill,* 119 N.H. 647, 406 A.2d 300 (N.H.1979); *Norwest v. Presbyterian Intercommunity Hospital,* 293 Or. 543, 652 P.2d 318 (Or.1982); *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1975); *Shelton v. Russell Pipe & Foundry Co.,* 570 S.W.2d 861 (Tenn.1978); *Landreth v. Reed,* 570 S.W.2d 486 (Tex.Ct. of Civ.App.1978). In these jurisdictions foreseeability that harm might result has become a primary factor in determining whether a duty exists.[2] As Harper and James state:

[T]he obligation to refrain from particular conduct is owed only to those who are

---

1. *But see* Justice Andrew's dissent in *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 349, 162 N.E. 99, 102 (1928) ("Due care is a duty imposed on each one of us to protect society from unreasonable danger, not to protect A, B, or C alone.").

2. The genesis of this approach can be found in Justice Cardozo's classic opinion in *Palsgraf v. Long Island R.R. Co., supra,* note 1, where he states: "The risk reasonably to be perceived defines the duty to be obeyed." 248 N.Y. at 344, 162 N.E. at 100.

foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous. Duty, in other words, is measured by the scope of the risk which negligent conduct foreseeably entails.

2 F. Harper & F. James, *The Law of Torts* § 18.2 (1956) (footnote omitted).

■ Beyond the question of foreseeability, the existence of duty also involves policy considerations underlying the core issue of the scope of the legal system's protection. *See D'Ambria v. United States*, 114 R.I. 643, 338 A.2d 524 (R.I.1975); Thode, *Tort Analysis: Duty-Risk v. Proximate Cause and the Rational Allocation of Functions Between Judge and Jury*, 1977 Utah L.Rev. 1, 27. Such considerations include the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant. *See, e.g., Lance v. Senior*, 36 Ill.2d 516, 224 N.E.2d 231 (1967); *see also Rowland v. Christion*, 69 Cal.2d at 113, 70 Cal.Rptr. at 100, 443 P.2d at 564; *Donohue v. Copiague Union Free School District*, 64 App.Div.2d 29, 33, 407 N.Y. S.2d 874, 877 (1978). Other broader policy considerations also enter the equation, but they are not so readily articulated. *See, e.g.,* Green, *Duties, Risks, Causation Doctrines*, 41 Tex.L.Rev. 42, 45 (1962); W. Prosser, *supra* at § 53.

■ Although we have never explicitly addressed the question of the existence of duty as a product of foreseeability of injury, we have held in the past that "[a]ctionable negligence necessarily includes the element of reasonable anticipation that some injury might result from the act of which complaint is made." *Matthews v. Cumberland & Allegheny Gas Co.*, 138 W.Va. 639, 653, 77 S.E.2d 180, 188 (1953). In a similar vein, we have held that "[d]ue care is a relative term and depends on time, place, and other circumstances. It should be in proportion to the danger apparent and within reasonable anticipation." Syllabus Point 2, *Johnson v. United Fuel Gas Co.*, 112 W.Va. 578, 166 S.E. 118 (1932); *see also State ex rel. Cox v. Sims*, 138 W.Va.

482, 77 S.E.2d 151 (1953). And in syllabus point one of *Dicken v. Liverpool Salt & Coal Co.*, 41 W.Va. 511, 23 S.E. 582 (1895), we held that "[n]egligence is the violation of the duty of taking care under the given circumstances. It is not absolute, but is always relative to some circumstances of time, place, manner, or person." These past decisions implicitly support the proposition that the foreseeability of risk is a primary consideration in establishing the element of duty in tort cases.

"Upon a motion for a directed verdict, all reasonable doubts and inferences should be resolved in favor of the party against whom the verdict is asked to be directed." Syllabus Point 5, *Wager v. Sine*, 157 W.Va. 391, 201 S.E.2d 260 (1973); *see also Jividen v. Legg*, 161 W.Va. 769, 245 S.E.2d 835 (1978); *Lambert v. Goodman*, 147 W.Va. 513, 129 S.E.2d 138 (1963). In this case the appellee required its employee LeMaster to work for over 27 hours at hard labor without rest, despite repeated requests that he be permitted to go home. When the appellee finally permitted LeMaster to cease work, it did not provide him sleeping quarters to rest before driving. Neither did the appellee offer to provide LeMaster transportation home, as it later did all its other employees who worked on the derailment. Rather, the appellee provided LeMaster transportation to his car at Nolan, approximately twenty-five miles farther from his home than the derailment site. On the way to Nolan, the obviously exhausted LeMaster fell asleep with a lighted cigarette in his hand in the presence of another of the appellee's employees.

Viewing these facts in the light most favorable to the appellants, we believe that the appellee could have reasonably foreseen that its exhausted employee, who had been required to work over 27 hours without rest, would pose a risk of harm to other motorists while driving the 50 miles from the appellee's office to his home. Indeed, it could be said that the appellee's negligent conduct under these facts was not merely a failure to exercise appropriate precautionary measures, but includes an element of affirmative conduct in requiring

LeMaster to work unreasonably long hours and then driving him to his vehicle and sending him out on the highway in such an exhausted condition as to pose a danger to himself or others. When such affirmative action is present, liability may be imposed regardless of the existence of a relationship between the defendant and the party injured by the incapacitated individual. *See Restatement (Second) of Torts* § 321, Comment a (1965); *Leppke v. Segura,* 632 P.2d 1057 (Colo.App.1981). *See also Clark v. Otis Engineering Corp.,* 633 S.W.2d 538 (Ct. of App.Tex.1982).

The appellee's reliance on *Pilgrim v. Fortune Drilling Co., Inc.,* 653 F.2d 982 (5th Cir.1981), is misplaced. In *Pilgrim,* where the plaintiff's claim was based on the employer's negligence in failing to prevent an employee from driving 117 miles to his home after completing a 12 hour shift, there was no evidence that the employee was incapacitated, or that the conduct of the employer involved an affirmative act which increased the risk of harm. Indeed, it appears that the issue raised by the appellants in this proceeding was specifically not addressed in *Pilgrim.*[3]

Accordingly, we conclude that the trial court erred in ruling that the appellee owed no duty to the appellants. We are unable to say as a matter of law that the appellee's conduct in requiring its employee to work such long hours and then setting him loose upon the highway in an obviously exhausted condition did not create a foreseeable risk of harm to others which the appellee had a duty to guard against.

## II.

The appellant next contends that any negligence on the part of the railway company was not the proximate cause of the appellants' injuries, and therefore the trial court correctly directed a verdict against the appellants. The thrust of the appellee's argument, and the basis upon which the court below posited its ruling, is that the negligence of LeMaster constituted an independent intervening cause of the accident which broke the chain of causation to the appellee.

We recently discussed the nature of an intervening cause which relieves a negligent defendant of liability in *Perry v. Melton,* 171 W.Va. 397, 299 S.E.2d 8 (1982). We held in syllabus point one of *Perry:* "An intervening cause, in order to relieve a person charged with negligence in connection with an injury, must be a negligent act, or omission, which constitutes a new effective cause and operates independently of any other act, making it and it only, the proximate cause of the injury." *Quoting* Syllabus Point 16, *Lester v. Rose,* 147 W.Va. 575, 130 S.E.2d 80 (1963); *see also Evans v. Farmer,* 148 W.Va. 142, 133 S.E.2d 710 (1963); *Smith v. Penn Line Service, Inc.,* 145 W.Va. 1, 113 S.E.2d 505 (1960); *Hartley v. Crede,* 140 W.Va. 133,

---

**3.** The court in *Pilgrim* framed the issue in this manner:

In their brief plaintiffs argue that "[i]t is negligent to allow a fatigued employee to drive on the public highways." They then suggested that "[t]he duty is to furnish transportation to exhausted employees, furnish sleeping quarters near the work site, reduce working hours, or otherwise supply alternatives to exhausted employees driving on public roads." We are not concerned here whether it is negligent for an employer to fail to furnish transportation to exhausted employees, to fail to provide sleeping quarters near the work site so exhausted employees can rest before driving, to fail to reduce working hours, or to otherwise fail to supply alternatives to exhausted employees driving on public roads. We are only concerned with whether it was negligent for this employer to *permit* its employee to drive home in an exhausted condition. That is the legal theory involved in the special issue submitted to the jury. We express no opinion on whether an employer could be negligent by failing to provide transportation to exhausted employees, to furnish sleeping quarters to them, etc. since we do not have the question before us.

653 F.2d at 982, fn. 8 (emphasis in original).

The appellants' complaint, on the other hand, alleges that the appellee was negligent in requiring LeMaster "to work for ... approximately thirty-two (32) hours straight without rest, and then to leave the ... place of employment without providing either rest or transportation home when it knew or should have known that its employee constituted a menace to the health and safety of the public." Thus, the issue raised by the appellants is precisely that unaddressed by the Fifth Circuit in *Pilgrim v. Fortune Drilling Co., Inc., supra.*

82 S.E.2d 672 (1954); *Wilson v. Edwards*, 138 W.Va. 613, 77 S.E.2d 164 (1953).

The theory advanced by the appellants at trial was that LeMaster's negligent conduct was a direct result of the mental fatigue and physical exhaustion attributable to the appellee's negligence in requiring him to work over 27 hours straight and then failing to provide rest or transportation home. In essence the appellants claim that "[t]he Defendant Railway's negligence reduced the capability of its employee to think and act as a reasonable person." If this is a reasonable conclusion to be drawn from the evidence presented, LeMaster's conduct would not constitute an intervening cause so as to relieve the railway company of liability. *See Perry v. Melton, supra.* Moreover, if the intervening cause is one which is to be reasonably anticipated, the defendant may be liable, for "[t]he risk created by the defendant may include the intervention of the foreseeable negligence of others." W. Prosser, *supra* at § 44.

These issues are questions for the jury. We have consistently held that "[t]he questions of negligence and contributory negligence are for the jury when the evidence is conflicting or when the facts, though undisputed, are such that reasonable men may draw difficult conclusions from them." Syllabus Point 3, *Davis v. Sargent*, 138 W.Va. 861, 78 S.E.2d 217 (1953). *See Donta v. Harper*, 168 W.Va. 237, 283 S.E.2d 921 (1981); *Brown v. Bluefield Municipal Building Commission*, 167 W.Va. 318, 280 S.E.2d 101 (1981); *Board of Ed. of Ohio County v. Van Buren and Firestone Architects, Inc.*, 165 W.Va. 140, 267 S.E.2d 440 (1980); *Wise v. Crown Construction Co., Inc.*, 164 W.Va. 393, 264 S.E.2d 463 (1980); *Bradley v. Sugarwood, Inc.*, 164 W.Va. 151, 260 S.E.2d 839 (1979); *Sullivan v. Billey*, 163 W.Va. 445, 256 S.E.2d 591 (1979); *Bourne v. Mooney*, 163 W.Va. 144, 254 S.E.2d 819 (1979); *Burgess v. Jefferson*, 162 W.Va. 1, 245 S.E.2d 626 (1978); *Utter v. United Hospital Center*, 160 W.Va. 703, 236 S.E.2d 213 (1977); *Wager v. Sine, supra.* *See also Restatement (Second) of Torts* § 434 (1965). We believe that on the evidence, reasonable persons could draw differing conclusions regarding the appellee's responsibility for the appellants' injuries. Accordingly, the trial court erred in directing a verdict for the appellee.

For the foregoing reasons, the order of the Circuit Court of Wayne County which grants the motion of Norfolk & Western Railway Company for a directed verdict is reversed, and the case is remanded for proceedings consistent with this opinion.

Reversed and remanded.