[No. 52839-0. En Banc. May 5, 1988.]

LINDA SUE BURKHART, as Personal Representative, ET AL, Appellants, v. GARY HARROD, ET AL, Respondents.

382

*Royce A. Ferguson, Jr.,* for appellants.

*Reed, McClure, Moceri, Thonn & Moriarty,* by *William R. Hickman, Pamela A. Okano,* and *Karin L. Nyrop,* for respondents.

DURHAM, J.—Under this state's common law, commercial furnishers of alcohol who serve "obviously intoxicated" customers can be held liable for damages caused by that intoxication. We are asked to extend this principle to impose liability on hosts of social parties who provide alcohol for their guests. We decline to do so. If social host liability is to be imposed in Washington, it should be done through the Legislature which has greater ability to fully explore the spectrum of competing societal interests.

I

Michael Burkhart was to have been the best man at the wedding of Charles and Denise Bonfante. On July 21, 1985, Burkhart participated in a wedding rehearsal and then attended the dinner party that followed. The party was held at the house of the groom's sister and brother–in–law, Suzanne and Gary Harrod. Burkart arrived with the other guests between 2 and 2:30 p.m. For the first half hour, Gary Harrod mixed drinks for the guests, and thereafter the bar was open for guests to mix their own drinks. Available at the bar were wine, beer, scotch, bourbon, vodka and

assorted nonalcoholic beverages. According to all seven affidavits filed by members of the groom's family, Burkhart consumed "a few" alcoholic drinks during the day, but he never appeared intoxicated. Dinner was served at 4:30 p.m. Most of the guests left at 6:30, but Burkhart stayed to watch the opening of wedding gifts and to help clean up. Burkhart drank at least one beer during the cleanup.

Around 9 p.m., the bride and groom left the party and drove to the groom's house. Burkhart followed them part of the way on his motorcycle, but then stopped at a store while the bride and groom continued on. A motorist later noticed that Burkhart was operating his motorcycle aggressively and erratically. A short time later, around 10 p.m., Burkhart's motorcycle left the roadway and struck a power pole, killing him instantly. At the time of the accident, Burkhart's blood alcohol content was .16 percent.

Linda Sue Burkhart, Michael's wife, brought a wrongful death action against the Harrods for negligently furnishing alcohol to an obviously intoxicated person. The trial judge granted summary judgment to the Harrods, holding that there is no social host liability in this state. We affirm.

## II

This court has adopted the common law rule that furnishers of alcohol are not liable for damages caused by the intoxication of the persons they serve. *Halvorson v. Birchfield Boiler, Inc.*, 76 Wn.2d 759, 458 P.2d 897 (1969). The common law rule, however, has exceptions, so that an action will still lie if alcohol is furnished to a person who is obviously intoxicated, helpless, or in a special relationship to the furnisher of the alcohol. *Young v. Caravan Corp.*, 99 Wn.2d 655, 658, 663 P.2d 834, 672 P.2d 1267 (1983); *Wilson v. Steinbach*, 98 Wn.2d 434, 438, 656 P.2d 1030 (1982). These principles recently have been reaffirmed. *Dickinson v. Edwards*, 105 Wn.2d 457, 461, 716 P.2d 814 (1986).

Liability has been imposed under these rules to commercial hosts (*see, e.g., Purchase v. Meyer*, 108 Wn.2d 220, 228–29, 737 P.2d 661 (1987); *Young v. Caravan Corp.*,

*supra*) and to quasi–commercial hosts, *i.e.,* those who did not sell alcohol but who otherwise had business interests in furnishing alcohol to their guests. *See Dickinson v. Edwards, supra.* However, this court never has held that a purely social host can be liable for furnishing alcohol.[1] *See Dickinson,* at 471 (Utter, J., concurring).

There are strong arguments both for and against social host liability. Proponents point first of all to the need to compensate victims injured by drunk drivers. *See Kelly v. Gwinnell,* 96 N.J. 538, 551, 476 A.2d 1219 (1984). Additionally, social host liability arguably could reduce the frequency of drunk driving by requiring hosts to use greater care in serving alcohol at social gatherings. *See Kelly,* at 551–52.

On the other hand, opponents stress the potentially substantial financial liability that social hosts would face, as well as the heavy burden that would be placed on social hosts to regulate guests' alcohol consumption. This duty to regulate the drinking of others would raise a series of problematic questions for social hosts. How is a social host, inexperienced at judging the extent to which others have become intoxicated, to decide the course of his own actions? Must the host determine if a guest has been drinking before arriving at the party? Can the host determine if a guest is drinking on an empty stomach? What if a guest is taking prescribed medication or using illegal drugs? Must the host count the number of drinks that each guest consumes? Is it necessary to gauge a guest's weight and height in order to determine allowable amounts of alcohol? May guests be allowed to mix their own drinks, or should the host tend the bar himself to monitor consumption? Must the host refrain from drinking in order to better supervise the guests? Must the host determine which of its

---

[1]In *Wilson v. Steinbach,* 98 Wn.2d 434, 656 P.2d 1030 (1982), this court held that summary judgment was properly granted in favor of a social host because there was no genuine issue of material fact as to obvious intoxication or either of the other two *Halvorson* exceptions. *Wilson,* at 439–40. Therefore, we did not have to reach the issue of social host liability.

guests will be driving home? Before guests depart, should the host conduct sobriety tests, asking them to recite the alphabet or walk a straight line? If an intoxicated guest insists on driving home, how far can the host go in preventing him from doing so? Must he offer to pay for a taxi or put the guest up for the night? As one court has noted, the implications of social host liability are "almost limitless". *Edgar v. Kajet,* 84 Misc. 2d 100, 103, 375 N.Y.S.2d 548 (1975), *aff'd,* 55 A.D.2d 597, 389 N.Y.S.2d 631 (1976).

■ The nature of the judicial role prevents us from capably deciding the relative merits of social host liability. Evaluating the overall merits of social host liability, with its wide sweeping implications, requires a balancing of the costs and benefits for society as a whole, not just the parties of any one case. Yet because judicial decisionmaking is limited to resolving only the issues before the court in any given case, judges are limited in their abilities to obtain the input necessary to make informed decisions on issues of broad societal impact like social host liability. In this regard, we fully concur in the statement that "'of the three branches of government, the judiciary is the least capable of receiving public input and resolving broad public policy questions based on a societal consensus.'" *Bankston v. Brennan,* 507 So. 2d 1385, 1387 (Fla. 1987) (quoting *Shands Teaching Hosp. & Clinics, Inc. v. Smith,* 497 So. 2d 644, 646 (Fla. 1986)). It is for this very reason that public policy usually is declared by the Legislature, and not by the courts. *See Felder v. Butler,* 292 Md. 174, 183, 438 A.2d 494 (1981).

The Legislature is uniquely able to hold hearings, gather crucial information, and learn the full extent of the competing societal interests. It can balance the relative importance of compensating the victims of drunk drivers with the burdens that liability would place on social hosts. Time can be taken to investigate a whole range of issues that are not before the court in any given case, such as the amount of damage caused by drunk drivers, the percentage of that damage for which a social host was at some point involved,

the extent to which automobile insurance of all types already provides a remedy to victims, the effect that the added liability would have on homeowners' and renters' insurance rates, the possibilities of alternative remedies such as having drunk drivers contribute to a statewide fund for victims, the possibilities of limiting the host's liability, and proscribing standards of conduct for social hosts. If substantial financial liability is to be attached to the hosting of a social gathering, heretofore considered an innocuous act, it should only be done after careful consideration of all the effects on society and it should be imposed as a comprehensive measure. The Legislature can do this, we cannot.

### III

■ We cannot simply hand this case off to the Legislature, however. We must involve ourselves to some degree in the debate on social host liability, recognizing that our decision here effectively will add fuel to one side's fire. There is good reason to withhold common law liability for social hosts even though such liability already exists for commercial and quasi–commercial hosts. Social hosts are not as capable of handling the responsibilities of monitoring their guests' alcohol consumption as are their commercial and quasi–commercial counterparts. In this regard, we agree with the reasoning of the Ohio Supreme Court:

> We find merit in appellee's assertion that a social provider of intoxicating beverages should not be held to the same duty of care that a commercial proprietor is subject to under [Ohio case law]. As the appellee points out, the commercial proprietor has a proprietary interest and profit motive, and should be expected to exercise greater supervision than in the (non–commercial) social setting. Moreover, a person in the business of selling and serving alcohol is usually better organized to control patrons, and has the financial wherewithal to do so.

*Settlemyer v. Wilmington Veterans Post 49, Am. Legion, Inc.,* 11 Ohio St. 3d 123, 127, 464 N.E.2d 521 (1984).

Additionally, the implications of social host liability are so much more wide sweeping and unpredictable in nature than are the implications of commercial host liability.

While liability for commercial providers affects only a narrow slice of our population, social host liability would touch most adults in the state on a frequent basis. Because social hosts are generally unaccustomed to the pressures involved in taking responsibility for the intoxication of their guests, we cannot predict how well social hosts would respond when the scope of their duties would be so ill defined. It is also difficult to estimate the effect that social host liability would have on personal relationships. Indeed, judicial restraint is appropriate when the proposed doctrine, as here, has implications that are "far beyond the perception of the court asked to declare it." *See Hamm v. Carson City Nugget, Inc.*, 85 Nev. 99, 101, 450 P.2d 358 (1969). Along these same lines, another court has stated:

> [W]e are unable to reasonably measure the widespread repercussions from extending "dramshop" liability to the social host, thus compelling our conclusion that a legislative response rather than a judicial response is the more appropriate answer under these circumstances.

*Harriman v. Smith*, 697 S.W.2d 219, 222 (Mo. Ct. App. 1985).

Finally, the only indication we have of legislative intent reveals a disinclination to impose social host liability. The Legislature long ago enacted a dramshop act which imposed civil liability in some situations on persons who had furnished alcohol to individuals who then became involved in a traffic accident. Laws of 1905, ch. 62, § 1, p. 120.[2] However, this act was repealed in 1955, thereby indicating a

---

[2]The dramshop act provided as follows:

"Every husband, wife, child, parent, guardian, employe, or other person who shall be injured in person or property, or means of support, by any intoxicated person, or in consequence of the intoxication, habitual or otherwise, of any person, shall have a right of action, in his or her own name, severally or jointly, against any person or persons who shall, by selling or giving intoxicating liquors, have caused the intoxication of such person, for all damages sustained, and the same may be recovered in a civil action in any court of competent jurisdiction. On the trial of such action, the plaintiff or plaintiffs must prove that such intoxicating liquors were sold under circumstances sufficient to lead a man or ordinary intelligence to believe that such sale would probably result in intoxication. . . ." Laws of 1905, ch. 62, § 1, p. 120.

disapproval of social host liability. Moreover, the Legislature has imposed penalties on those who *sell* liquor to intoxicated persons, but not on those who *give* it to intoxicated persons. *See* RCW 66.44.200. This distinction implies that the Legislature intends to treat commercial hosts differently than social hosts. *See generally Dickinson v. Edwards,* 105 Wn.2d 457, 486–99, 716 P.2d 814 (1986) (Durham, J., dissenting).

For all these reasons, we decline to extend common law liability to social hosts. This is not to say, however, that social host liability is necessarily an inappropriate reaction to the problem of drunk driving. Rather, we hold only that the judiciary is ill equipped to impose such a remedy.

## IV

We note that our decision to defer the issue of social host liability to the Legislature is fully supported by precedent both within and without this state. In *Halvorson v. Birchfield Boiler, Inc.,* 76 Wn.2d 759, 458 P.2d 897 (1969), after noting a distinction between commercial and social hosts, we concluded as follows:

> It may be that the social and economic consequences of "mixing gasoline and liquor" should lead to a rule of accountability by those who furnish intoxicants to one who becomes a tort–feasor by reason of intoxication, but such a policy decision should be made by the legislature after full investigation, debate and examination of the relative merits of the conflicting positions.

*Halvorson,* at 765. The same statement has been reiterated in more recent opinions issued by courts in this state. *See Wilson v. Steinbach,* 98 Wn.2d 434, 441–42, 656 P.2d 1030 (1982); *Hulse v. Driver,* 11 Wn. App. 509, 513–14, 524 P.2d 255, *review denied,* 84 Wn.2d 1011 (1974). Courts in other states also have deferred to their legislatures on the issue of social hosts liability. *E.g., Bankston v. Brennan,* 507 So. 2d 1385, 1387 (Fla. 1987); *Miller v. Moran,* 96 Ill. App. 2d 596, 601, 421 N.E.2d 1046 (1981); *Boutwell v. Sullivan,* 469 So. 2d 526, 529 (Miss. 1985); *Andres v. Alpha Kappa Lambda Fraternity,* 730 S.W.2d 547, 553 (Mo. 1987) (adopting analysis of *Harriman v. Smith,* 697 S.W.2d 219, 221–22

(Mo. Ct. App. 1985)); *Conigliaro v. Franco,* 122 A.D.2d 15, 504 N.Y.S.2d 186 (1986); *Garren v. Cummings & McCrady, Inc.,* 289 S.C. 348, 345 S.E.2d 508 (Ct. App. 1986); *Settlemyer v. Wilmington Veterans Post 49, Am. Legion, Inc., supra.*[3]

It has been argued that when the Legislature has ignored an area of tort law, the courts should not defer to legislative judgment, but should instead use the common law to in effect legislate new tort law. *See, e.g.,* Peck, *Comments on Judicial Creativity,* 69 Iowa L. Rev. 1 (1983–84); Peck, *The Role of the Courts and Legislatures in the Reform of Tort Law,* 48 Minn. L. Rev. 265 (1963); *Dickinson v. Edwards, supra* at 481 (Utter, J., concurring). More specifically, Professor Peck argues that "[i]t is in areas of legislative inactivity that the judiciary may safely perform a creative role." Peck, 69 Iowa L. Rev. at 9. However the Legislature has been anything but inactive with respect to drunk driving issues. Only recently we recognized that the Legislature is continually updating its statutes on drunk driving. *Purchase v. Meyer,* 108 Wn.2d 220, 223 n.1, 737 P.2d 661 (1987). We note also the recent enactment of RCW 5.40-.060,[4] establishing a new defense in tort actions involving intoxication issues:

It is a complete defense to an action for damages for personal injury or wrongful death that the person injured or killed was under the influence of intoxicating liquor or any drug at the time of the occurrence causing the injury

---

[3]We note that some jurisdictions have proceeded to decide the merits of social host liability. Of these jurisdictions, most have rejected social host liability because of the principle that it is the consumption of alcohol, not the furnishing of it, that proximately causes the victim's injuries. *E.g., Klein v. Raysinger,* 504 Pa. 141, 470 A.2d 507 (1983); *Fruit v. Schreiner,* 502 P.2d 133 (Alaska 1972); *Whittaker v. Jet–Way, Inc.,* 152 Mich. App. 795, 394 N.W.2d 111 (1986). However, we have already rejected this analysis. *Dickinson v. Edwards,* 105 Wn.2d 457, 461, 716 P.2d 814 (1986). Other courts have imposed social host liability as part of the common law. *E.g., Kelly v. Gwinnell,* 96 N.J. 538, 476 A.2d 1219 (1984); *Koback v. Crook,* 123 Wis. 2d 259, 366 N.W.2d 857 (1985). For the reasons discussed above, we decline to follow their lead.

[4]This statute has no bearing on the present case because it is applicable only to claims filed on or after August 1, 1986. Laws of 1986, ch. 305, § 910, p. 1367.

or death and that such condition was a proximate cause of the injury or death and the trier of fact finds such person to have been more than fifty percent at fault. . . .

The Legislature also considered numerous bills relating to drunk driving in its most recent session.[5] Accordingly, there is no reason for the judiciary to take on a more creative role in usurping powers of legislation. In this regard, we echo the statements of the Ohio Supreme Court:

> We are mindful of the fact that since the ratification of the Twenty–First Amendment to the United States Constitution, virtually every aspect involved in the manufacture, sale and distribution of alcoholic beverages has been regulated by the General Assembly. Thus, we are of the opinion that any policy modifications which are designed to encompass the potential liability of social providers of intoxicating beverages should perhaps be deferred to the sound discretion of the legislature.

*Settlemyer v. Wilmington Veterans Post 49, Am. Legion, Inc.*, 11 Ohio St. 3d 123, 127, 464 N.E.2d 521 (1984).

## V

In summary, we decline to hold social hosts to the same standards that the common law requires of commercial hosts. If social host liability is to be imposed in Washington, it should be done through the legislative process.

---

[5]Several bills addressed drunk driving, including the following: the intoxication defense statute quoted above (Senate Bill 6048, enacted as Laws of 1987, ch. 212, § 1001, p. 792); a proposal that the traffic safety commission develop a statewide comprehensive program to address the problem of drinking and driving (Proposed Senate Bill 5843, 50th Legislature (1987), at § 3); a proposed ban on the concurrent sale of gasoline and alcohol (Proposed House Bill 438, Proposed Senate Bill 5397, 50th Legislature (1987)); a proposed schedule of civil fines for drunk driving infractions (Proposed Senate Bill 5700, 50th Legislature (1987)); a proposal for installation of ignition interlock devices on cars driven by habitual drunk drivers (Proposed House Bill 852, Proposed Senate Bill 5233, 50th Legislature (1987)); a proposal to allow the confiscation of DWI offenders' vehicles (Proposed House Bill 890, 50th Legislature (1987)); and a proposal allowing police to confiscate drivers' licenses of intoxicated drivers involved in vehicular assaults or homicides (Proposed House Bill 335, 50th Legislature (1987)).

Accordingly, we affirm the trial court's dismissal of Burkhart's complaint by summary judgment.

DOLLIVER, DORE, ANDERSEN, CALLOW, and GOODLOE, JJ., and SKIMAS, J. Pro Tem., concur.

UTTER, J. (concurring)—The facts presented do not indicate Burkhart was obviously intoxicated either at the time he drank at the Harrods' party or when he left on his motorcycle. The majority opinion's statements regarding the absence of social host liability are therefore dicta and not controlling on a future case presenting different facts. I believe there are facts under which a social host should be liable, using well settled principles of negligence law, to persons injured as a proximate result of the host serving alcohol to an obviously intoxicated guest and then failing to take reasonable measures to insure the guest does not drive on public roads. That question, however, is not before us in this case.

Considering only the relevant and admissible evidence, and viewing such evidence in a light most favorable to Burkhart, there is no evidence indicating Burkhart was obviously intoxicated either at the time the Harrods furnished him alcohol or at the time he left the Harrod residence by motorcycle.

The only relevant evidence presented regarding Burkhart's intoxication is the way he appeared to those around him. *Purchase v. Meyer,* 108 Wn.2d 220, 737 P.2d 661 (1987); *Wilson v. Steinbach,* 98 Wn.2d 434, 439, 656 P.2d 1030 (1982). Appellants rely on a blood alcohol level of .16 and expert testimony based on the blood alcohol level to raise an inference of obvious intoxication at time of service. Given the recent decisions in *Purchase* and in *Dickinson v. Edwards,* 105 Wn.2d 457, 716 P.2d 814 (1986), evidence of blood alcohol content and expert testimony based on such test results is inadmissible on the issue of obvious intoxication.

Appellants contend that expert testimony based on the blood alcohol content should be admissible to establish the amount of alcohol Burkhart consumed at the party. In *Dickinson,* this court found evidence of the amount of alcohol consumed relevant on the issue of obvious intoxication. *Dickinson,* at 464–65 (plurality opinion). However, as this court observed in *Purchase,* at 227–28, *Dickinson* was factually unique because the driver admitted to the number of drinks he had consumed and the officer observed the driver just 10 minutes after leaving the drinking establishment.

Even if expert testimony could establish the amount of alcohol consumed, the expert testimony here is not competent. The experts based their opinions on Burkhart having consumed alcohol only between 2 and 6 p.m. However, appellants contend that Burkhart continued drinking after dinner ended at 6:30 p.m. Burkhart may have drunk more alcohol after stopping at a store to buy beer; a 2–quart bottle of Olde English 800 malt liquor, three–fourths full, was found at the scene. Even granting appellants every favorable inference and assuming the beer had leaked out of the bottle, the experts based their opinions on an inaccurate set of assumptions regarding when at the party Burkhart had consumed alcohol; the opinions must be considered speculative and irrelevant, and therefore inadmissible. *See, e.g., Myers v. Harter,* 76 Wn.2d 772, 781–82, 459 P.2d 25 (1969).

Appellants have also submitted post–service observations by a motorist who saw Burkhart driving erratically and aggressively as if he were intoxicated shortly before the accident. The key to admitting post–service firsthand observations lies in the reliability of any inference of obvious intoxication that can be drawn from such evidence. Essential to the inference's reliability is the proximity to the time Burkhart was last furnished alcohol, whether Burkhart consumed any alcohol after he left the party, and whether any time remained unaccounted for between the last furnishing and the post–service evidence. *Dickinson,* at 464. *Dickinson*'s narrow facts were that the police officer's

observations came just 10 minutes after the driver had left the drinking establishment. *Purchase,* 108 Wn.2d at 227. Here, the observations of Burkhart's driving came up to 1 hour after he left respondents' home and after he stopped at a store and purchased beer. These observations more closely resemble a police officer's observations "an hour or two" after service of alcohol and found inadmissible in *Purchase.* Appellants also submitted as evidence observations by the police officer who arrived at the scene of the accident and stated that Burkhart's body smelled of alcohol. Those observations suffer the same infirmities as the firsthand observations shortly before the accident and are inadmissible.

The only other evidence of Burkhart's obvious intoxication at the time of service was the typewritten transcript of tape–recorded interviews conducted by respondents' insurance agent. These allegedly inconsistent statements include one by the groom's sister that Burkhart "did kick one or two drinks over." When read in context this statement refers to the number of drinks consumed, and not to any obviously intoxicated behavior. In addition, the bride–to–be, when asked by the insurance investigator if she noticed Burkhart was under the influence of alcohol, answered: "That night . . . no. Because by then it was way later." This ambiguous statement loses any sting in the context of her entire statement, which made it clear that she did not observe signs of obvious intoxication at any point in the day or evening.

In sum, there is no evidence that the Harrods knew or had reason to know Burkhart was obviously intoxicated when he last drank alcohol at their party or when he left on his motorcycle. In fact, the affidavits of those observing Burkhart at the party unanimously state that Burkhart showed no signs of obvious intoxication.

### Negligence Standard

Because the evidence does not indicate Burkhart was obviously intoxicated, this case does not present the issue

of the liability of a social host with regard to obviously intoxicated guests. If such evidence were present, unlike the majority, I would find a social host has a duty to take reasonable measures to prevent a guest from driving on public roads after the host furnishes the guest with alcohol when the guest is obviously intoxicated.

I recognize that my statements in this regard, if they were in the majority opinion of this case, would be dicta. Similarly, the majority's sweeping statements immunizing social hosts from liability are dicta. Although our discussions are outside the scope of the facts presented here, the majority's statements should not be left unchallenged lest it be assumed they are unanswerable. The best way to test them is with a hypothetical scenario: A social host continues to serve alcohol to a guest who is obviously intoxicated, perhaps even encouraging the guest to continue imbibing; the host knows that the guest is driving a vehicle home but takes no steps to deter the guest; the guest then strikes a pedestrian; the guest has no resources from which to compensate the pedestrian.

We must view the issue of social host liability in the context of existing tort law. Tort law is overwhelmingly court–developed common law. Statutes influence tort law, either by creating standards of behavior or by explicitly changing substantive law rules previously developed by courts. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 3, at 19 (5th ed. 1984). Otherwise, courts have the responsibility to develop the common law in response to social or technological changes, and to fine tune the law to be more just.[6]

In developing common law, we must consider not only compensation to injured victims (which the New Jersey Supreme Court considered the crucial factor in extending

---

[6]When over–arching principles of justice are not accommodated by traditional theories of tort recovery, we do not hesitate to take measured steps to advance more just theories of tort recovery, as can be seen in cases such as *Martin v. Abbott Labs.*, 102 Wn.2d 581, 689 P.2d 368 (1984).

liability to social hosts in *Kelly v. Gwinnell,* 96 N.J. 538, 548, 551, 476 A.2d 1219 (1984)), but also public policy. One reason for imposing liability is to provide an incentive in the right place to avoid the loss altogether. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 4, at 25 (5th ed. 1984). "There is good reason . . . to make a conscious effort to direct the law along lines which will achieve a desirable social result, both for the present and for the future." W. Keeton § 3, at 16.

In the context of the hypothetical then, the question is whether the social host or the pedestrian is in a better position to avoid the loss. The answer is clear: the social host. Imposing social host liability will "make it more likely that hosts will take greater care in serving alcoholic beverages at social gatherings so as to avoid . . . economic liability". *Kelly,* at 552.

The second inquiry is whether preexisting principles of tort liability are consistent with social host liability. Negligent conduct consists of (1) the existence of a duty owed to the complaining party; (2) a breach thereof; and (3) a resulting injury. *E.g., LaPlante v. State,* 85 Wn.2d 154, 159, 531 P.2d 299 (1975). A cause of action by a party injured as a result of a social host's providing alcohol to an obviously intoxicated guest easily falls within this framework.

## 1. Duty

In developing the scope of tort liability for negligence actions, we have held, "The question of duty encompasses the concept of foreseeability." *Maltman v. Sauer,* 84 Wn.2d 975, 980, 530 P.2d 254 (1975). In other words, absent some special immunity, actors are responsible for the foreseeable consequences of their acts. "Generally, the duty to use ordinary care is bounded by the foreseeable range of danger." *Wells v. Vancouver,* 77 Wn.2d 800, 803, 467 P.2d 292 (1970). It is beyond question that a foreseeable result of "mixing gasoline and liquor" is, at the least, some driving error, or at the most a tragic accident. The California Supreme Court observed it is "evident that the service of

alcoholic beverages to an obviously intoxicated person by one who knows that such intoxicated person intends to drive a motor vehicle creates a *reasonably foreseeable* risk of injury to those on the highway." *Coulter v. Superior Court*, 21 Cal. 3d 144, 152–53, 577 P.2d 669, 145 Cal. Rptr. 534 (1978) (abrogated by California Senate Bill 1645 (1978)). Our society has become increasingly aware of the dire consequences of drunk driving, partly through the admirable efforts of grass roots groups such as Mothers Against Drunk Drivers and Students Against Drunk Drivers.

## 2. Breach of Duty

"[N]egligence consists in the doing of an act which a reasonable man would not have done, or in the failure to do an act which a reasonable man would have done under similar circumstances." *System Tank Lines, Inc. v. Dixon*, 47 Wn.2d 147, 151, 286 P.2d 704 (1955). In the hypothetical, the social host's doing nothing to deter the intoxicated guest from driving was not reasonable, considering it was the host who made the guest unable to drive safely, and perhaps unable to perceive his incapacity. Naturally, it is for the finder of fact to determine if the host has an excuse for failing to deter the guest, such as fear of physical harm.

## 3. Resulting Injury

This court has rejected the theory that providers have not proximately caused injuries caused by those provided with alcohol. "[T]he court's analysis of proximate cause changed from 'the *drinking* of the liquor is the proximate cause of the injury' to 'the *furnishing* of the liquor is the proximate cause of the injury.'" *Dickinson,* at 461. In the hypothetical, the host has thus proximately caused the pedestrian's injuries. I choose not to discuss the issue of allocation of damages between hosts and guests in the absence of that issue in this case.

It requires no extension of existing tort principles to impose liability on social hosts who have put their guests in

no position to drive. "If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect." Restatement (Second) of Torts § 321(1), at 132 (1965). In *Robertson v. LeMaster,* ___ W. Va. ___, 301 S.E.2d 563 (1983), the West Virginia Supreme Court found an employer liable under this common law principle for encouraging an employee to work unreasonably long hours and then sending him out on the highway in an exhausted condition. As one commentator noted in comparing *Robertson* with the social host situation:

> In both instances, the driver's condition is a natural and foreseeable result of the host's or employer's actions, which the host or employer should realize have created a dangerous situation. Although a tired or intoxicated driver always has the option not to drive, in many cases her condition may be such that she does not recognize that option. The *Robertson* court did not suggest that the employer should have prevented the employee from driving; it did suggest, however, that the employer should have provided the employee with an alternative.

Comment, *Social Hosts and Drunken Drivers: A Duty To Intervene?,* 133 U. Pa. L. Rev. 867, 890 (1985).

Because all the elements of a negligence cause of action are present in the social host hypothetical presented above, the majority's denial of compensation to victims injured as a proximate result of the host's unreasonable actions must rest on some sort of immunity.

The courts and Legislature in this state are very reluctant to grant immunity for tortious conduct, absent very compelling public interests. Some traditional common law immunities have been abolished in the interest of providing just remedies. Thus the interest of preserving "peace and tranquility of the home" was found insufficient justification to perpetuate inter–spousal immunity in *Freehe v. Freehe,* 81 Wn.2d 183, 187, 500 P.2d 771 (1972). The "need of financial encouragement and protection" of charitable

institutions was found insufficient justification to perpetuate charitable immunity in *Friend v. Cove Methodist Church, Inc.,* 65 Wn.2d 174, 176, 396 P.2d 546 (1964). Sovereign immunity was statutorily abolished. RCW 4.96.010.

Where the Legislature has enacted statutory immunities, it is generally in response to a compelling social need. Thus, providers of emergency care are immune from ordinary negligence suits under RCW 4.24.300. Reporters of child abuse are immune from suit under RCW 26.44.060. This court grants immunity to parties and counsel for allegedly libelous statements made in the course of judicial proceedings based on a public policy of granting them utmost freedom to secure justice. *McNeal v. Allen,* 95 Wn.2d 265, 267, 621 P.2d 1285 (1980).

The majority cites no compelling public policy, even in its dicta, for granting immunity to social hosts. The only justification the majority offers for granting immunity to social hosts where commercial providers have no such immunity is that the latter are "only a narrow slice of our population, [whereas] social host liability would touch most adults in the state on a frequent basis." Majority, at 387. This is not a proper basis for granting tort immunity. The entire population of this state is liable for the foreseeable consequences of unreasonable behavior.

Commercial hosts are liable to parties injured as a result of their serving alcohol to obviously intoxicated patrons. *E.g., Dickinson.* There is no logical reason to deny recovery to victims injured as a proximate result of equally unreasonable actions by social hosts. Indeed, I must now agree with Justice Durham's statement in her dissent in *Dickinson,* "[T]he inevitable extension of the majority rationale dictates a finding of liability for a social host." *Dickinson,* at 489. The consequences to the victims are the same, whether the driver's host was commercial or social. And there is no convincing reason to see the host's responsibility to the victim any differently based on whether he or she benefits commercially from serving alcohol. *See* Comment,

*Social Hosts and Drunken Drivers: A Duty To Intervene?*, 133 U. Pa. L. Rev. 867, 869 (1985).

The majority seems concerned that hosts will worry they will be held liable for serving guests that are *not* obviously intoxicated. The majority thus poses a fretful list of inquiries that hosts presumably would make if confronted with liability. "Can the host determine if a guest is drinking on an empty stomach? . . . Is it necessary to gauge a guest's weight and height in order to determine allowable amounts of alcohol? . . . Before guests depart, should the host . . . [ask] them to recite the alphabet or walk a straight line? . . ." Majority, at 384–85. This list, while entertaining, is irrelevant. There is no issue of liability of social hosts that serve alcohol to guests who cleverly hide their intoxication. As with the existing liability of commercial hosts, social host liability is not asserted to attach except where the guest is *obviously*[7] intoxicated. *See, e.g., Dickinson.* That some hosts may have a groundless worry about whether they will be found liable when their guests are not in fact obviously intoxicated is trivial. The justice in compensating victims injured or killed as a proximate result of hosts serving truly obviously intoxicated guests alcohol and then failing to deter their driving on public roads is compelling.

Although, by definition, it will be "obvious" to social hosts when their guests are "obviously intoxicated", it will not always be clear to the hosts what steps to take in response to such guests intending to drive away from the social event. I recognize that it is not uncommon for intoxicated persons to be very assertive of their desire to drive, and some might become intimidating to their hosts. "We have all heard of belligerent drunks." *Kelly,* at 567 (Garibaldi, J., dissenting). On the other end of the spectrum, it might be merely embarrassing to the host to point out to a guest that the guest would be better to temporarily refrain from driving.

---

[7]The relevant dictionary definition of "obvious" is: "capable of easy perception". *Webster's Third New International Dictionary,* at 1559.

I propose the following standards to determine if a host has acted reasonably:

1. Liability attaches only where the social host has provided an obviously intoxicated guest with alcohol. The host has no liability if the guest has consumed the alcohol before arriving, or has imbibed his or her own alcohol while on the host's premises without the host's knowledge.

2. Liability attaches only where the host knows or has reason to know the guest intends to drive a motor vehicle away from the host's premises.

3. Hosts should verbally express to obviously intoxicated guests that the host does not wish the guest to drive while in that condition. Hosts should present reasonable alternatives to such guests: *e.g.,* letting the guest stay until no longer impaired, providing alternative means of transportation, or lending money for taxi fare.

4. In no case is a host liable for failing to perform acts that might endanger his or her physical well being. *See* Comment, *Recognizing the Liability of Social Hosts Who Knowingly Allow Intoxicated Guests To Drive: Limits to Socially Acceptable Behavior,* 60 Wash. L. Rev. 389, 403 (1985).

5. Social embarrassment alone is not an excuse for failing to take reasonable steps to deter the guest from driving. Comment, 60 Wash. L. Rev., at 403.

These standards give hosts a choice. They can either refrain from providing alcohol to guests that are obviously intoxicated, or they can take reasonable steps to prevent such guests from driving. The standards certainly do not impose an onerous burden on hosts. I believe responsible hosts follow these or higher standards already.

## DEFERENCE TO LEGISLATURE

The majority would be correct in deferring to the Legislature if the Legislature had in fact spoken on the issue of social host liability or immunity. However, our Legislature has not determined whether to grant immunity to social hosts for injuries caused by providing alcohol to intoxicated

guests and then failing to take reasonable measures to deter their guests from driving. Because it is the traditional role of the courts to develop the common law of tort liability, the Legislature's inaction in this area is no deterrent to this court.

We are competent to rule on this, or any other issue in which we must consider both the rights of the parties and public policy. "If each change in society occasioned by technological and other developments involving potential negligent harm to individuals requires legislation before tort liability results, justice would have been and would continue to be unnecessarily illusory in too many instances." *Halvorson v. Birchfield Boiler, Inc.*, 76 Wn.2d 759, 768, 458 P.2d 897 (1969) (Finley, J., dissenting).

The majority attempts to infer a "legislative intent" from the absence of a statute penalizing social hosts for their furnishing liquor to persons under the influence of liquor. Majority, at 387.[8] Determination of legislative intent, to the extent that the diverse members of our Legislature can be said to have a single intent, is a proper inquiry in the context of statutory interpretation. *E.g., Grant v. Spellman*, 99 Wn.2d 815, 818, 664 P.2d 1227 (1983) ("duty of the court is to ascertain and give effect to the intent and purpose of the Legislature, *as expressed in the act*"). (Italics mine.) In the absence of a statute, we do not decide cases before us by inquiring of the Legislature how it would rule.

Although "legislative intent" is irrelevant in the absence of a controlling statute, the Legislature can guide us on issues of public policy to assist in the development of common law. *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 390–93, 26 L. Ed. 2d 339, 90 S. Ct. 1772 (1970). "A court may look to statutes not only as mandates on issues directly addressed but also as sources of 'establishment of

---

[8]I do not discuss the majority's reliance on the repeal of the dramshop act, as the repeal of that act has been disposed of in *Halvorson v. Birchfield Boiler, Inc.*, 76 Wn.2d 759, 458 P.2d 897 (1969) as irrelevant to the development of the common law.

policy [that] carries significance beyond the particular scope of each of the statutes involved.'" W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 3, at 20 (5th ed. 1984) (quoting *Boston Housing Auth. v. Hemingway*, 363 Mass. 184, 293 N.E.2d 831, 840 (1973)).

The Legislature has stated:

> The legislature finds and declares:
>     (1) There is a need to reduce the incidence of drivers on the highways and roads of this state who, because of their use, consumption, or possession of alcohol, pose a danger to the health and safety of other drivers;

RCW 46.20.710. Besides this unambiguous declaration, we can easily infer from the legislative acts listed by the majority and statutes such as RCW 46.20.710–.750 that the Legislature has determined public policy supports using every traditional and creative means available to deter drunk driving. See majority, at 390.

It is not only the Legislature that is concerned about the tragedies and waste associated with drunk driving. The attitudes of society have matured to the point that very few would find that social pleasures of mutual imbibing, combined with the enjoyment of driving, are more important to society than the risk to potential innocent victims caused by drunk driving. As the New Jersey Supreme Court noted when it imposed liability on social hosts:

> Unlike those cases in which the definition of desirable policy is the subject of intense controversy, here the imposition of a duty is both consistent with and supportive of a social goal—the reduction of drunken driving—that is practically unanimously accepted by society.

*Kelly*, at 545.

The "decision to defer the issue of social host liability to the Legislature", majority, at 388, is not a meaningful choice. "[W]here relevant legislation does not exist, courts must by necessity decide a controversy without legislative guidance. In doing so within a common law system in which each decision is precedent, they necessarily make law." W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and*

*Keeton on Torts* § 3, at 18 (5th ed. 1984). There is no need to reiterate that the Legislature may overturn our decision today by enacting legislation on the subject of social host liability. Given the narrow facts of this case, the majority's asserted decision to defer to the Legislature is not binding on future action of this court and is, in addition, erroneous as a matter of law and policy.

CONCLUSION

The summary judgment must be affirmed, but only on the fact that there is no evidence Burkhart was obviously intoxicated. The statements of the majority in dicta are unnecessary and incorrect and not controlling on future cases where the issue is before us. Compelling reasons exist not to grant social hosts immunity from liability for injuries proximately caused by their providing alcohol to obviously intoxicated guests where the hosts then fail to take reasonable steps to prevent the guests from driving.

BRACHTENBACH, J. (concurring)—I concur with Justice Utter only as to the first portion of his opinion, *i.e.,* prior to that denominated "negligence standard."