541 S.E.2d 576

**Richard AIKENS and Motel 81, Inc., d/b/a Martinsburg Econo–Lodge, Plaintiffs,**

v.

**Robert DEBOW and Craig Paving, Inc., Defendants.**

No. 27376.

Supreme Court of Appeals of West Virginia.

Submitted June 7, 2000.

Decided Nov. 6, 2000.

Concurring Opinion of Justice Starcher Jan. 16, 2001.

D. Michael Burke, Burke & Schultz, Martinsburg, for Plaintiffs.

Michael D. Lorensen, Tracey A. Rohrbaugh, Bowles Rice McDavid Graff & Love, PLLC, Martinsburg, for Defendants.

SCOTT, Justice.

This case arises upon certified question from the Circuit Court of Berkeley County and presents the issue of entitlement to recovery in tort of economic loss not accompanied by bodily injury or property damage, a matter not previously resolved with precision by this Court.

## I. Factual and Procedural Background

Plaintiff [1] Richard Aikens operates a motel and restaurant known as the Martinsburg Econo–Lodge ("Econo–Lodge"), which is located on Route 901 and can be accessed by exiting from Interstate 81 at the Spring Mills Road exit. While the Route 901 overpass bridge permits the shortest, most-convenient means of accessing the Econo–Lodge for south-bound travelers traveling on I–81, the establishment can still be accessed through alternate routing. On September 18, 1996, Defendant Robert Debow, a truck driver and employee of Defendant Craig Paving, Inc., was driving a flatbed truck north on I–81 carrying a trackhoe. Because the trackhoe was too high to pass safely under the Route 901 overpass, an accident resulted which caused substantial damage to the bridge. It was closed for nineteen days to make the necessary repairs.

Plaintiff instituted the underlying cause of action on May 28, 1997, seeking recovery for the decreased revenues he experienced due to closure of the Route 901 overpass. Asserting that his reduced revenues were proximately caused by the accident, Plaintiff seeks recovery of $9,000 in lost income.

Arguing that as a matter of law Plaintiff could not recover for his economic losses in the absence of direct bodily injury or property damage, Defendants moved for summary judgment. The circuit court denied Defendants' motion for summary judgment, ruling that "there are factual issues in this case pertaining to causation and foreseeability which remain appropriate for jury determination." The circuit court further held that, "under West Virginia law, the Plaintiff may not be barred from recovering for economic injuries alleged to have been suffered as a result of the Defendants' negligence."

Following the circuit court's denial of Defendants' motion for summary judgment, the parties requested and the circuit court agreed to certification of the following issue:

Whether a claimant who has sustained no physical damage to his person or property may maintain an action against another for

1. An additional named plaintiff is Motel 81, Inc., d/b/a Martinsburg Econo–Lodge.

negligent injury to another's property which results consequentially in purely economic loss to the claimant.

The circuit court answered this question in the affirmative. In syllabus point three of *Kincaid v. Mangum*, 189 W.Va. 404, 432 S.E.2d 74 (1993), we explained:

> When a certified question is not framed so that this Court is able to fully address the law which is involved in the question, then this Court retains the power to reformulate questions certified to it under both the Uniform Certification of Questions of Law Act found in W.Va.Code, 51–1A–1, *et seq.*, and W.Va.Code, 58–5–2 [1967], the statute relating to certified questions from a circuit court of this State to this Court.

Recognizing that this Court, in addressing certified questions, has "retained the right to address them with some flexibility[,]" we reframe the question presented in the case sub judice to more thoroughly encompass the full breadth of the question to be answered. *Miller v. Lambert*, 195 W.Va. 63, 69, 464 S.E.2d 582, 588 (1995). The question, as reformulated, is consequently as follows:

> May a claimant who has sustained purely economic loss as a result of an interruption in commerce caused by negligent injury to the property of a third person recover damages absent either privity of contract or some other special relationship with the alleged tortfeasor?

We answer this question in the negative.

## II. Standard of Review

■ We recognized in syllabus point one of *Light v. Allstate Insurance Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998), "[a] de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court." This same standard requiring de novo review applies equally to legal issues presented by circuit courts.

## III. The Existence of a Duty

■ The resolution of any question of tort liability must be premised upon fundamental concepts of the duty owed by the tortfeasor.

"In order to establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken." Syl. Pt. 1, *Parsley v. General Motors Acceptance Corp.*, 167 W.Va. 866, 280 S.E.2d 703 (1981).

Syl. Pt. 4, *Jack v. Fritts*, 193 W.Va. 494, 495, 457 S.E.2d 431, 432 (1995). Importantly, the determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather, "[t]he determination of whether a plaintiff is owed a duty of care by the defendant must be rendered as a matter of law by the court." *Id.* at 498, 457 S.E.2d at 435. Only the related questions of negligence, due care, proximate cause, and concurrent negligence which present jury issues, as we explained in syllabus point five of *Hatten v. Mason Realty Co.*, 148 W.Va. 380, 135 S.E.2d 236 (1964): "Questions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them." *Id.* at 381, 135 S.E.2d at 238, syl. pt. 5.

Given our reliance on *Hatten*, we must address a recent misapprehension of that decision in *Harris v. R.A. Martin, Inc.*, 204 W.Va. 397, 513 S.E.2d 170 (1998), a per curiam opinion. In discussing the determination that a genuine issue of material fact existed regarding a city employee's injury, this Court asserted that it had repeatedly held that duty is a question of fact for jury determination. *Id.* at 402, 513 S.E.2d at 175. As support for this assertion, however, the opinion references the above-quoted syllabus point from *Hatten*, as well as three other opinions citing to that syllabus point. Syllabus point five of *Hatten* does not stand for the proposition that the existence of duty is a question of fact. To the contrary, it declares that "[q]uestions of negligence, due care, proximate cause, and concurrent negligence" are questions of fact for the jury. 148 W.Va. at 381, 135 S.E.2d at 238, syl. pt. 5. The initial determination of the existence of a

duty, however, continues to be an issue resolved by the trial court. To correct any misconception this anomaly of *Harris* might have generated, we restate the law of this State, as follows: The determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law.

This declaration is in accord with prior West Virginia law, as well as legal commentators on this issue. In *Miller v. Whitworth*, 193 W.Va. 262, 455 S.E.2d 821 (1995), this Court explained that "[w]e are mindful that the determination of whether there is a duty is a question of law and not a question of fact for the jury." *Id.* at 265, 455 S.E.2d at 824. Likewise, legal commentators agree that "[t]he determination of any question of duty ... has been held to be an issue of law for the court rather than for the jury, to be determined by reference to the body of statutes, rules, principles, and precedents which make up the law ." 57A Am.Jur.2d *Negligence* § 86, at 142 (2d. ed.1989) (footnote omitted).

■ We recognized in *Robertson v. LeMaster*, 171 W.Va. 607, 301 S.E.2d 563 (1983), that while foreseeability of risk is a primary consideration in determining the scope of a duty an actor owes to another, "[b]eyond the question of foreseeability, the existence of duty also involves policy considerations underlying the core issue of the scope of the legal system's protection[.]" *Id.* at 612, 301 S.E.2d at 568. "Such considerations include the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant." *Id.*

■ In *Puffer v. Hub Cigar Store*, 140 W.Va. 327, 84 S.E.2d 145 (1954), *overruled on other grounds as stated in, Mallet v. Pickens*, 206 W.Va. 145, 522 S.E.2d 436 (1999), this Court held in syllabus point five: " 'To be actionable, negligence must be the proximate cause of the injury complained of and must be such as might have been reasonably expected to produce an injury.' Point 3, syllabus, *Hartley v. Crede*, [140] W.Va. [133,

82 S.E.2d 672]." *Accord Wehner v. Weinstein*, 191 W.Va. 149, 444 S.E.2d 27 (1994). "A person is not liable for damages which result from an event which was not expected and could not reasonably have been anticipated by an ordinarily prudent person." *Puffer*, 140 W.Va. at 328, 84 S.E.2d at 148, syl. pt. 6.

■ Emphasizing the relationship between foreseeability and duty, we explained in syllabus point three of *Sewell v. Gregory*, 179 W.Va. 585, 371 S.E.2d 82 (1988):

> The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?

Commentators have similarly evaluated the critical element of duty:

> [T]he obligation to refrain from particular conduct is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous. Duty, in other words, is measured by the scope of the risk which negligent conduct foreseeably entails.

2 F. Harper & F. James, *The Law of Torts* § 18.2 (1956) footnote omitted.

### IV. Restrictions on Limitless Expansion of Duty

The appropriate application of these fundamental tort principles has served as a source of great controversy. Justice Benjamin Cardozo, in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), expressed the danger of expanding the concept of duty in tort to include economic interests and consequent exposure of defendants "to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implicating of a duty that exposes to these consequences." *Id.* at 444. The ascertainment of

a universal and inviolate formula for defining the parameters of duty in the abstract has proven evasive.

Perhaps the most acclaimed declaration of the concept of duty was announced by Justice Cardozo in *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99 (1928), three years prior to the decision quoted above. In *Palsgraf,* Justice Cardozo succinctly observed: "The risk reasonably to be perceived defines the duty to be obeyed." *Id.* at 100. The frequently cited reasoning of *Palsgraf* was premised upon the following factual scenario: An individual carrying a package of fireworks was pushed by a Long Island Railroad employee while attempting to board the train. The individual dropped the package of fireworks, and the resulting shock of the explosion caused some of the scales at the other end of the platform to fall, striking the plaintiff. *Id.* at 99. The court concluded that the plaintiff could not recover against the railroad because the employee's conduct did not involve any foreseeable risk of harm to the plaintiff. 162 N.E. at 101. The fact that the conduct was unjustifiably risky toward the individual carrying the fireworks was deemed irrelevant. Justice Cardozo reasoned the "risk imports relation; it is the risk to another or to others within the range of apprehension." *Id.* at 100. *"What we do mean by the word 'proximate' [in causation] is that, because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics." Id.* at 103 (Andrews, J., dissenting) (emphasis supplied)

The United States Supreme Court has also recognized the need to draw a line to prevent unfettered imposition of unlimited exposure to liability. The Supreme Court reasoned that the doctrine of remoteness is a component of proximate cause, which in turn embraces the concept that "the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Associated Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 536, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

The need to restrict the spatial concept of duty to something less than the limits of logical connection was cogently stated as follows in *In re Exxon Valdez,* No. A89–0095–CV, 1994 WL 182856 (D.Alaska March 23, 1994):

> There is no question but that the Exxon Valdez grounding impacted, in one fashion or another, far more people than will ever recover anything in these proceedings. There is an understandable public perception that if one suffers harm which is perceived to be a result of the conduct of another, the harmed person should be compensated. That perception does not always square up with the institutional guidelines (statutes and case law) under which the court must operate. It is the function of both Congress and the courts (principally the courts of appeal and supreme courts) to determine the extent to which public expectations with respect to financial responsibility are to be realized. Legal liability does not always extend to all of the foreseeable consequences of an accident. In the area of harm to one's body, the reach of what is recoverable is very great. Where one's property is injured, the extent of legal liability is considerable, but not to the same extent as with bodily injury. Where pure economic loss is at issue—not connected with any injury to one's body or property, and especially where that economic loss occurs in a marine setting—the reach of legal liability is quite limited except as to commercial fishermen.[2]

---

2. The Ninth Circuit, in *Union Oil Co. v. Oppen,* 501 F.2d 558 (9th Cir.1974), found that the routine reliance by commercial fishermen upon an ability to fish in unpolluted waters satisfied the foreseeability requirement and justified an award of economic damages as an exception to the general rule. The Ninth Circuit emphasized that offshore oil producers have a duty to commercial fishermen to conduct their operations in a reasonably prudent manner designed to avoid any diminution in marine life. *Id.* at 570; *see also*

*Pruitt v. Allied Chemical Corp.*, 523 F.Supp. 975 (E.D.Va.1981) (commercial fishermen were permitted to recover economic damages as an exception to the general rule prohibiting economic damages). The rationale for this limited exception for commercial fishermen was explained in *Burgess v. M/V Tamano,* 370 F.Supp. 247 (D.Me. 1973), *aff'd per curiam,* 559 F.2d 1200 (1st Cir. 1977). In *Tamano,* the court reasoned that while fishermen and clammers have no individual

. . . .

> *Were it otherwise, we would have a form of organized anarchy in which no one could count on what rule would apply at any given time or in any given situation.*

*Id.* at 8–9 (footnote and emphasis added).

While the holding of the majority in *Harris* is not in conflict with our decision in the present case, we underscore the reasoning of Justice Maynard in his insightful dissent in *Harris.* Justice Maynard cautioned against the limitless expansion of the element of duty, postulating that the majority had "so expand[ed] the element of duty, that its existence now becomes almost a given in any tort case. If a party is injured by the conduct of another, there must have been a duty to avoid such conduct." 204 W.Va. at 403, 513 S.E.2d at 176. In his dissent, Justice Maynard quoted, with approval, the following language from 57A Am.Jur.2d *Negligence* § 87:

> A line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit. It is always tempting to impose new duties and, concomitantly, liabilities, regardless of the economic and social burden. Thus, the *courts have generally recognized that public policy and social considerations, as well as foreseeability, are important factors in determining whether a duty will be held to exist in a particular situation.*

204 W.Va. at 403, 513 S.E.2d at 176 (emphasis supplied).

The obvious question: Who draws the line demarcating tort liability? Who, in our society, has the burden of defining the existence and extent of the element of "duty" in tort actions? It necessarily falls to the courts to consider all relevant claims of the competing parties; to determine where and upon whom the burden of carrying the risk of injury will fall; and to draw the line, to declare the existence or absence of "duty," in every case, as a matter of law. The temptation is to accede to the arguments of logical connection in every instance of resulting harm while, in fact, the consequences of pure logic would be socially and economically ruinous.

## V. Traditional Approach—No Economic Damages in the Absence of Physical Impact

The sole issue presented for our resolution is whether economic loss from an interruption in commerce in the absence of damage to a plaintiff's person or property is recoverable in a tort action. While this Court has never directly addressed this issue, other jurisdictions, almost without exception, have concluded that economic loss alone will not warrant recovery in the absence of some special relationship between the plaintiff and the tortfeasor. In the seminal decision of *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), the United States Supreme Court refused to permit recovery from the dry dock owner when plaintiffs were denied use of a vessel for two weeks because of a third party's act of negligence during the ship's refurbishing. In establishing this long-standing rule of denying recovery in tort for indirect economic injury, Justice Holmes articulated the rationale, based upon English and American precedent, that continues to justify the nonexistence of a legally cognizable or compensable claim for such attenuated injuries even today:[3] "The law does not spread its protection so far." *Id.* at 309, 48 S.Ct. 134. In writing *Robins Dry Dock,* Justice Holmes relied upon the reasoning of the English case of *Elliott Steam Tug Co. v. The Shipping Controller,* 1 K.B. 127 (1922), in which recovery was refused for negligent interference

property rights to the aquatic life harmed by oil pollution, the fishermen could sue for tortious invasion of a public right, having suffered damages greater in degree than the general public. 370 F.Supp. at 250. The court recognized the oil spill as an interference with the "direct exercise of the public right to fish and to dig clams" which was, in fact, a special interest different from that of the general public. *Id.*

3. In *Robins Dry Dock,* the court stated:

> [A]s a general rule, at least, a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong.

275 U.S. at 309, 48 S.Ct. 134.

with contractual rights.[4] *See Holt Hauling & Warehousing Sys., Inc. v. M/V Ming Joy,* 614 F.Supp. 890, 896 n. 13 (E.D.Pa.1985) (rejecting argument that *Robins Dry Dock* only applies to "interference with economic expectancies generally or only to interference with contractual interests" and stating that the precept established by *Robins Dry Dock* " 'is essentially a principle of disallowance of damages because of remoteness' ") (quoting *Venore Transp. Co. v. M/V Struma,* 583 F.2d 708, 710 (4th Cir.1978)).

Where the factual scenario involves a plaintiff's contractual right to use property damaged by a tortfeasor, courts have invoked the Restatement of Torts as a basis for denying causes of action limited to economic damages. In *Philip Morris, Inc. v. Emerson,* 235 Va. 380, 368 S.E.2d 268 (1988), the plaintiff sought recovery of lost profits to his campground business due to the negligent release of gases from the defendant's property. Citing the well-recognized principle in the Restatement of Torts [5] which recognizes that interference with the ability to contract with third persons is too remote to permit recovery, the court refused to permit recovery of the profits plaintiffs allegedly sustained from his inability to contract with campers for overnight stays. 368 S.E.2d at 282 (citing Restatement (Second) of Tort § 766 (1979)).

In denying economic damages in the absence of physical impact, courts frequently refer to this element of remoteness between the injury and the act of negligence that is the source of such injury. In *Rickards v.*

*Sun Oil Co.,* 23 N.J. Misc. 89, 41 A.2d 267 (N.J.Sup.1945), a case remarkably similar to the one under scrutiny by this Court, plaintiff business owners sought to recover "losses from expectant gains" from a defendant whose barge negligently damaged a drawbridge which served as the only means of access to the island on which plaintiffs' business premises were situated. *Id.* at 268. In granting the defendant's motions to strike the complaints, the court held that "[defendant's] negligent action may be a cause of injury to the plaintiffs, but it is not the natural and proximate effect of such negligence and therefore [is] not actionable." *Id.* The court observed:

The entire doctrine assumes the defendant is not necessarily to be held for all consequences of his acts. Professor McLaughlin, Article 39 Harvard Law Review (Dec.1925) 149 at 155. It is fundamental that there must be some reasonable limitation of liability for the commission of the tort. The wrongdoer is not liable in the eyes of the law for all possible consequences. He is thus responsible in damages only for the natural and probable consequence of his negligent act.

41 A.2d at 269 (citation omitted). The court recognized that "[n]o rule embraces within its scope all the resulting consequences of the given act. The effect would be to impose a liability entirely disproportionate to the act committed or to the failure to perform the duty assumed." *Id.*

In *Kahl v. Love,* 37 N.J.L. 5, 1874 WL 7397 (N.J.Sup. 1874), the New Jersey Su-

---

**4.** The prohibition against economic recovery in tort in the absence of physical impact is apparent in the context of product liability actions, in which the economic losses are essentially contractual and allocable by the parties, as reflected in purchase price warranties, or insurance. *See Bocre Leasing Corp. v. General Motors Corp.,* 84 N.Y.2d 685, 688, 621 N.Y.S.2d 497, 645 N.E.2d 1195 (1995). Courts have recognized the difficulty of transposing the rationale underlying the economic loss doctrine within the product liability framework to ordinary negligence cases where the contractual, commercial elements are absent. We therefore reference the product liability economic loss rule as a similar legal paradigm, often resolved with reasoning analogous to that employed within this realm, but we refrain from placing emphasis upon those cases or relying upon their rationales in resolving the case sub

judice due to the obviously distinguishable factual and relational scenarios which provoke such litigation.

**5.** Section 766 provides as follows:

Negligent Interference with Contract or Prospective Contractual Relation. One is not liable to another for pecuniary harm not derived from physical harm to the other, if that harm results from the actor's negligently
  (a) causing a third person not to perform a contract with the other, or
  (b) interfering with the other's performance of his contract or making the performance more expensive or burdensome, or
  (c) interfering with the other's acquiring a contractual relation with a third person.

preme Court observed that not everyone who suffers a loss can maintain a suit.

> The limit of the doctrine relating to actionable negligence is, that the person occasioning the loss must owe a duty, arising from contract or otherwise, to the person sustaining such loss. Such a restriction on the right to sue for a want of care in the exercise of employments or the transaction of business, is plainly necessary to restrain the remedy from being pushed to an impracticable extreme. *There would be no bounds to actions and litigious intricacies, if the ill effects of the negligences of men could be followed down the chain of results to the final effect.*

*Id.* at 8 (emphasis supplied); *see also In re Marine Navigation Sulphur Carriers, Inc. v. Lone Star Indus.,* 638 F.2d 700, 702 (4th Cir.1981) (affirming district court's dismissal of plaintiff's claims for economic damages arising from bridge closing and noting that "[t]he economic, nonphysical losses as alleged were too remote to be legally compensable"); *Petition of Kinsman Transit Co.,* 388 F.2d 821, 825 (2d Cir.1968) (denying recovery to plaintiffs who incurred economic expense due to destructive chain of ship wrecks, ice drifts, and bridge damage and observing that "the connection between defendants' negligence and the claimants' damages is too tenuous and remote to permit recovery").[6]

In *General Foods Corp. v. United States,* 448 F.Supp. 111 (D.Md.1978), the plaintiff manufacturer sought to recover economic damages from the defendant bridge owner for economic damages allegedly arising from the closing of the Penn Central Railroad Bridge over the Chesapeake and Delaware Canal caused by a ship wreck. Citing *Robins Dry Dock* for the proposition that economic losses suffered by the plaintiff in conducting its business, even if proven, are not recoverable damages as a matter of law, the court dismissed plaintiff's complaint, explaining:

> Courts which have addressed this issue have repeatedly expressed concern that a contrary rule would open the door to virtually limitless suits, often of a highly speculative and remote nature. Such suits would expose the negligent defendant to a severe penalty, and would produce serious problems in litigation, particularly in the areas of proof and apportionment of damages.

448 F.Supp. at 113.

In an analogous case, *Nebraska Innkeepers, Inc. v. Pittsburgh–Des Moines Corp.,* 345 N.W.2d 124 (Iowa 1984), the Iowa Supreme Court considered the viability of an action brought by various business owners to recover purely economic losses resulting from the closure of a bridge to repair certain structur-

---

**6.** *See also Kingston Shipping Co., Inc. v. Roberts,* 667 F.2d 34 (11th Cir.1982), *cert. denied, ABC Containerline N.V. v. Kingston Shipping Co.,* 458 U.S. 1108, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982) (holding that vessel owners could not recover economic losses resulting from delayed passage of vessel, where such delays were allegedly caused by defendant's negligence); *DeVillegas v. Quality Roofing, Inc.,* No. CV920294190S, 1993 WL 515671 at *3 (Conn.Super.Ct.1993) (denying recovery of economic damages and stating that the "long established common law rule in this state is that in the absence of privity of contract between the plaintiff and defendant, or of an injury to the plaintiff's person or property, a plaintiff may not recover in negligence for a purely economic loss"); *Willis v. Georgia Northern Railway Co.,* 169 Ga.App. 743, 314 S.E.2d 919 (1984) (concluding that employees could not recover lost wages due to the closure of employer's plant which was allegedly caused by negligence of defendant railway company); *Local Joint Executive Board v. Stern,* 98 Nev. 409, 651 P.2d 637 (1982) (ruling that hotel employees could not recover lost wages due to hotel fire allegedly caused by defendant's negligence); *General Public Util. v. Glass Kitchens of Lancaster, Inc.,* 374 Pa.Super. 203, 542 A.2d 567 (1988) (denying economic loss damages to corporations associated with the Pennsylvania Dutch tourist industry who sought damages for economic loss due to diminution of visitors to Lancaster County after Three Mile Island nuclear incident); *Moore v. Pavex, Inc.,* 356 Pa.Super. 50, 514 A.2d 137 (1986) (ruling that "there could be no recovery for economic loss by the plaintiffs in this case who did not suffer physical harm to property in which they had a proprietary interest"); *United Textile Workers v. Lear Siegler Seating Corp.,* 825 S.W.2d 83 (Tenn.Ct.App.1990) (holding that industrial park employees could not recover economic damages without physical damage when park was closed due to gas leak allegedly caused by defendant's negligence); *Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.,* 29 S.W.3d 282, 2000 WL 1289406 (Tex.App.2000) (holding that economic loss could not be recovered in negligence action against gas lines operator, based upon absence of duty).

al defects.[7] Affirming the lower court's grant of summary judgment to defendants, the court recognized, as "uniform[,]" the position of rejecting negligence actions seeking pure economic damages "regardless of how vital to the claimant be the flow of commerce that is interrupted." *Id.* at 126. Critical to the court's ruling was its conclusion that "[e]xceptions to that general rule such as ownership of the bridge, physical injury or direct damages to the claimant's property or person, or a direct contractual relation with the alleged wrongdoer [we]re not factually present here." *Id.*

The recognized necessity of imposing a line of demarcation on actionable theories of recovery serves as another rationale for the denial of purely economic damages. In *Stevenson v. East Ohio Gas. Co.*, 73 N.E.2d 200 (Ohio Ct.App.1946), the Ohio court held that employees of a neighboring company could not recover lost wages incurred after they were evacuated due to an explosion and fire allegedly caused by the defendant's negligence. The *Stevenson* court reasoned as follows:

> While the reason usually given for the refusal to permit recovery in this class of cases is that the damages are "indirect" or are "too remote" it is our opinion that the principal reason that has motivated the courts in denying recovery in this class of cases is that *to permit recovery of damages in such cases would open the door to a mass of litigation which might very well overwhelm the courts so that in the long run while injustice might result in special cases, the ends of justice are conserved.*
> . . .

*Id.* at 203 (emphasis added).

In similar fashion, the Seventh Circuit, in affirming the district court's dismissal of an action seeking economic damages arising from a bridge closing, reasoned that extension of liability in the absence of harm to a plaintiff's person or property would thrust courts into "a field with no sensible or just stopping point." *Leadfree Enterprises, Inc. v. United States Steel Corp.*, 711 F.2d 805, 808 (7th Cir.1983) (citing *Hass v. Chicago &*

*North Western Ry. Co.*, 48 Wis.2d 321, 179 N.W.2d 885, 888 (1970)). The court observed further in *Leadfree Enterprises*, that "[i]n the economic injury case, there is less a fear of fraudulent claims than a sense of wanting to have a sensible stopping point in order to preclude open-ended, crushing liability on a tortfeasor." 711 F.2d at 808; *see also Dundee Cement Co. v. Chemical Labs., Inc.*, 712 F.2d 1166, 1172 (7th Cir.1983) (discussing policy reasons advocating against permitting third party recovery of economic losses and "conclud[ing] that there is a legitimate fear that a crushing burden of litigation would result from allowing recovery for economic damages like this").

Astutely anticipating the economic chaos that would result from permitting theoretically limitless recovery of economic injury, the court in *Aikens v. Baltimore & Ohio R.R. Co.*, 348 Pa.Super. 17, 501 A.2d 277 (1985), denied recovery for indirect economic losses incurred by employees who lost wages due to the defendant's alleged negligence in causing a train derailment which damaged the plaintiffs' employer's plant. The court affirmed the dismissal of the complaint and opined:

> that allowance of a cause of action for negligent interference with economic advantage would create an undue burden upon industrial freedom of action, and would create a disproportion between the large amount of damages that might be recovered and the extent of the defendant's fault. To allow a cause of action for negligent cause of purely economic loss would be to open the door to every person in the economic chain of the negligent person or business to bring a cause of action. Such an outstanding burden is clearly inappropriate and a danger to our economic system.

*Id.* at 279 (citation omitted).

In analyzing the development of legal theories regarding the efficacy of permitting economic damages in the absence of physical harm, the United States Court of Appeals for the Fifth Circuit in *State of Louisiana v. M/V Testbank*, 752 F.2d 1019 (5th Cir.1985),

---

**7.** Plaintiffs sought recovery in negligence as well as in strict liability and breach of implied warranty and fitness for a particular purpose. 345 N.W.2d at 125.

reexamined the authority and scope of *Robins Dry Dock.* Two vessels had collided in the Mississippi River Gulf Outlet, resulting in a chemical spill. Fearing widespread contamination, authorities closed the outlet to navigation for approximately twenty days. Forty-one plaintiffs, including commercial fishermen, operators of marinas, bait and tackle shops, cargo terminal operators, and restaurant owners filed suit, and those actions were consolidated. In its canvass of relevant case law, the *M/V Testbank* court acknowledged the opposition to the exclusionary policy prohibiting recovery of economic damages in the absence of physical impact and noted that "[t]he push to delete the restrictions on recovery for economic loss lost its support and by the early 1940's had failed." *Id.* at 1023. The majority of the court reasserted the traditional interpretation of *Robins Dry Dock* and concluded that all claims for economic loss in the absence of physical injury should be excluded:

> After extensive additional briefs and oral argument, we are unpersuaded that we ought to drop physical damage to a proprietary interest as a prerequisite to recovery for economic loss. To the contrary, our reexamination of the history and central purpose of this pragmatic restriction on the doctrine of foreseeability heightens our commitment to it. Ultimately we conclude that without this limitation foreseeability loses much of its ability to function as a rule of law.

752 F.2d at 1021. A concurring justice expressed reservation that the issues of proximate cause, foreseeability, and remoteness could "alone provide an adequate guide for distinguishing, on a normative, pre-event basis, between the classes of cases in which recovery will be allowed and those in which it will not." *Id.* at 1035 (Garwood, J., concurring).

### VI. The Minority View: Recovery of Economic Damages Under Limited Circumstances

A few jurisdictions have permitted recovery of economic damages without damage to person or property under certain limited circumstances. The New Jersey Supreme Court's approach to this concept is recognized as the leading authority for the minority view and represents a departure from a substantial collection of American and British cases. In *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 N.J. 246, 495 A.2d 107 (1985), the New Jersey court permitted economic recovery where a leak of toxic chemicals from a railway car forced a twelve-hour evacuation of a commercial airline office building adjacent to the site of the leak. *Id.* at 115. The plaintiff sought to recover expenses incurred for flight cancellations, lost bookings and revenue, and certain operating expenses. In permitting the action, the court applied a special foreseeability rule, reasoning that the defendant would be liable only for damages proximately caused and requiring that the defendant must have "knowledge or special reason to know of the consequences of the tortious conduct in terms of the persons likely to be victimized and the nature of the damages likely to be suffered...." *Id.*

Narrowly crafting its decision to apply to a limited and particularized group, the New Jersey court held:

> that a defendant owes a duty of care to take reasonable measures to avoid the risk of causing economic damages, aside from physical injury, to particular plaintiffs or plaintiffs comprising an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct. A defendant failing to adhere to this duty of care may be found liable for such economic damages proximately caused by its breach of duty.

495 A.2d at 116. In further explaining its rationale for departure from established doctrine, the New Jersey court noted:

> the close proximity of the North Terminal and People Express Airlines to the Conrail freight yard; the obvious nature of the plaintiff's operations and particular foreseeability of economic losses resulting from an accident and evacuation; the defendants' actual or constructive knowledge of the volatile properties of ethylene oxide; and the existence of an emergency response plan prepared by some of the de-

fendants (alluded to in the course of oral argument), which apparently called for the nearby area to be evacuated to avoid the risk of harm in case of an explosion. *Id.* at 118. In fashioning its test, the court in *People Express* determined that liability and foreseeability "stand in direct proportion to one another[:] The more particular is the foreseeability that economic loss will be suffered by the plaintiff as a result of defendant's negligence, the more just is it that liability be imposed and recovery allowed." *Id.* at 116.

An analysis of the facts involved in the *People Express* decision supports the conclusion that the New Jersey court traversed a logical path more closely akin to that navigated in cases involving physical damage to property. Subsequent to the Three Mile Island nuclear incident, plaintiffs similarly asserted claims of temporary loss of use of property and "damage to property" as a result of the intrusion of radioactive materials through the ambient air. In resolving their claims in *Commonwealth of Pennsylvania v. General Public Utilities Corp.*, 710 F.2d 117 (3rd Cir.1983), the United States Court of Appeals for the Third Circuit acknowledged that the complaints did not contain any claim of damages for direct physical damage to any of the plaintiffs' property. *Id.* at 120–21. While the lower court had concluded that the losses claimed were purely economic in nature and unrecoverable, the plaintiffs contended that "increased radioactivity and radioactive materials emitted during the nuclear incident permeated the entire area, and this rendered the public buildings unsafe for a temporary period of time, and constituted a physical intrusion upon the plaintiffs' properties." *Id.* at 122. The plaintiffs maintained that the gaseous intrusion satisfied the requirement of physical harm to justify the recovery of damages in tort. The Third Circuit found that the plaintiffs' contentions were sufficient to defeat a motion for summary judgment, permitting the plaintiffs an opportunity to prove that an invasion by an invisible substance may still constitute a physical damage warranting recovery of economic loss. Similar to the inhabitability problems experienced by the Three Mile Island plaintiffs, the plaintiff's

building in *People Express* was rendered uninhabitable by the negligent release of toxic gases. Thus, in *People Express,* the New Jersey court could have reached its decision by reasoning that to render a building uninhabitable by releasing poison gas against it constitutes a direct physical damage to that building.

Analysts of the *People Express* rationale have also criticized the wisdom of that approach by emphasizing that the "Court itself noted the contradictory and inconsistent nature of its reasoning" by acknowledging the inherent limitations to predicating recovery on a principle of particular foreseeability. *Lear Siegler,* 825 S.W.2d at 86. The *People Express* court stated that "there will arise many similar cases that cannot be resolved by our decision today." 495 A.2d at 117. The court further recognized that:

> some cases will present circumstances that defy the categorization here devised to circumscribe a defendant's orbit of duty, limit otherwise boundless liability and define an identifiable class of plaintiffs that may recover. In these cases, the courts will be required to draw upon notions of fairness, common sense and morality to fix the line limiting liability as a matter of public policy, rather than an uncritical application of the principle of particular foreseeability.

495 A.2d at 116.

In another case typically referenced as supportive of a minority position on this issue, a California court applied the "special relationship" exception and permitted a restaurant owner to sue for lost profits allegedly caused by a contractor's failure to promptly install and maintain an air conditioner. *J'Aire Corp. v. Gregory,* 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (1979). The plaintiff introduced evidence that the reliance upon the air conditioning function was repeatedly brought to the defendant's attention. In concluding that such action could be maintained, the court explained that "a contractor owes a duty of care to the tenant of a building undergoing construction work to prosecute that work in a manner which does not cause undue injury to the tenant's business, where such injury is reasonably fore-

seeable." *Id.* at 66. The court's decision to permit recovery was expressly predicated on the existence of a special relationship: "Where a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity." *Id.* at 63.

In another case frequently cited as support for the minority position, an employer sought recovery for economic loss sustained as a result of tortious injuries to his employees. *Mattingly v. Sheldon Jackson College,* 743 P.2d 356 (Alaska 1987). Plaintiff's employees were injured when a trench dug by Sheldon Jackson College employees collapsed, which prevented them from cleaning a drainpipe. Plaintiff sought recovery of economic damages as a result of the loss of services of his employees. Pivotal to the Alaska Supreme court's decision to permit economic recovery in this case was its determination that the plaintiff was a "foreseeable and particularized plaintiff." *Id.* at 361. Although recovery of economic damages was permitted, the court made clear that such recovery is only permitted where it can be established that the defendant owed a duty to "particular plaintiffs or plaintiffs comprising an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct." *Id.* at 360 (quoting *People Express,* 495 A.2d at 116).

The special relationship between the plaintiff and the alleged tortfeasor was also emphasized in another case frequently cited for the minority view. In *Hawthorne v. Kober Construction Co.,* 196 Mont. 519, 640 P.2d 467 (1982), the plaintiff had suffered economic losses due to a delay in the shipment of steel. The court acknowledged that "[t]he action is one for negligence in the performance of a contractual duty." *Id.* at 470. Concluding that such action could be maintained because of the foreseeability of harm, the court relied upon Prosser's textbook reasoning:

> [B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person.

640 P.2d at 470 (citing Prosser, Law of Torts, 4th Ed., Section 93.)

### VII. Conclusion

After thoroughly considering the intricacies of a potential rule permitting the recovery of economic damages absent physical or personal injury, we conclude that an individual who sustains purely economic loss from an interruption in commerce caused by another's negligence may not recover damages in the absence of physical harm to that individual's person or property, a contractual relationship with the alleged tortfeasor, or some other special relationship between the alleged tortfeasor and the individual who sustains purely economic damages sufficient to compel the conclusion that the tortfeasor had a duty to the particular plaintiff and that the injury complained of was clearly foreseeable to the tortfeasor. The existence of a special relationship will be determined largely by the extent to which the particular plaintiff is affected differently from society in general. It may be evident from the defendant's knowledge or specific reason to know of the potential consequences of the wrongdoing, the persons likely to be injured, and the damages likely to be suffered. Such special relationship may be proven through evidence of foreseeability of the nature of the harm to be suffered by the particular plaintiff or an identifiable class and can arise from contractual privity or other close nexus. As observed by the Maryland court in *L & P Converters v. Alling & Cory Co.,* 100 Md. App. 563, 642 A.2d 264 (Md.1994), a civil action in which the tort of negligent misrepresentation was asserted, "Where failure to exercise due care only creates a risk of economic loss, an intimate nexus between the parties is generally required. The requirement of an intimate nexus is satisfied by contractual privity or its equivalent." *Id.* at 267 (citations omitted). The Maryland court

continued, "In the absence of contractual privity, its equivalent has been found and a tort duty imposed when 'a sufficiently close nexus or relationship' is shown." *Id.* (quoting *Weisman v. Connors*, 312 Md. 428, 540 A.2d 783, 793 (1988)). Any attempt by this Court to more specifically define the parameters of circumstances which may be held to establish a "special relationship" would create more confusion than clarity.

■ We base our holding upon our analysis of the complexities of this area of tort law, demonstrated through both historical evolvement and current concerns, and our belief that a hybrid approach must be fabricated to authorize recovery of meritorious claims while simultaneously providing a barrier against limitless liability. The common thread which permeates the analysis of potential economic recovery in the absence of physical harm is the recognition of the underlying concept of duty. Absent some special relationship, the confines of which will differ depending upon the facts of each relationship, there simply is no duty. A thorough examination of the cases comprising what has been referenced as the minority view reveals reasoning similar to ours, which provides the opportunity for recovery only upon a showing of a special relationship between the plaintiff and alleged tortfeasor and narrowly tailors the recovery to conform to the facts of the case under scrutiny.

■ Our decision under the limited factual scenario presented in this certified question has no impact upon our prior rulings permitting recovery of purely economic damages in negligence actions where a special relationship exists between the plaintiff and the alleged tortfeasor. Our holding in the case sub judice is, in fact, consistent with the rationale underlying such rulings, and we affirm our previous recognition that where a special and narrowly defined relationship can be established between the tortfeasor and a plaintiff who was deprived of an economic benefit, the tortfeasor can be held liable. In cases of that nature, the duty exists because of the special relationship. The special class of plaintiffs involved in those cases were particularly foreseeable to the tortfeasor, and the economic losses were proximately caused by the tortfeasor's negligence.

For example, auditors [8] have been held liable to plaintiffs who bought stock in reliance upon a financial statement negligently prepared for a corporation; surveyors [9] and termite inspectors [10] liable to remote purchasers of property; engineers [11] and architects [12] liable to contractors who relied upon plans negligently prepared for property owners who later hired the contractors; attorneys [13] and notaries public [14] liable to ben-

8. *See H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 461 A.2d 138 (1983) (finding independent auditor whose negligence resulted in an inaccurate public financial statement held liable to plaintiff who bought stock in company; stock subsequently proved to be worthless).

9. *See Capper v. Gates*, 193 W.Va. 9, 454 S.E.2d 54 (1994) (holding evidence supported finding that defendant surveyor was negligent in connection with unsuccessful subdivision project.); *Rozny v. Marnul*, 43 Ill.2d 54, 250 N.E.2d 656 (1969) (finding surveyor whose negligence resulted in error in depicting boundary of lot held liable to remote purchaser).

10. *See Stemple v. Dobson*, 184 W.Va. 317, 400 S.E.2d 561 (1990) (inspectors charged with negligence in failing to discover termite infestation during termite inspection.); *Hardy v. Carmichael*, 207 Cal.App.2d 218, 24 Cal.Rptr. 475 (Cal.Ct. App.1962) (termite inspectors whose negligence resulted in purchase of infested home liable to out-of-privity home buyers).

11. *See National Sand, Inc. v. Nagel Constr., Inc.*, 182 Mich.App. 327, 451 N.W.2d 618 (1990) (sub-

contractor could recover additional contract costs from engineering firm which negligently prepared plans).

12. *See Board of Educ. v. Van Buren and Firestone, Architects, Inc.*, 165 W.Va. 140, 267 S.E.2d 440 (1980) (permitting board of education maintained action against contractor, engineer, and bonding company for alleged negligence in site preparation for school project); *Donnelly Constr. Co. v. Obera/Hunt/Gilleland*, 139 Ariz. 184, 677 P.2d 1292, 1295 (1984) (holding architect, hired by county, liable to contractor for increased cost of construction due to errors in plans and specifications).

13. *See Keister v. Talbott*, 182 W.Va. 745, 391 S.E.2d 895 (1990) (examining attorney's negligence in certifying or examining title to real estate); *Lucas v. Hamm*, 56 Cal.2d 583, 15 Cal. Rptr. 821, 364 P.2d 685 (1961), cert. denied 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962) (finding attorney whose negligence deprived intended beneficiary of proceeds of the will was liable to beneficiary); *Heyer v. Flaig*, 70 Cal.2d

eficiaries of negligently prepare wills; real estate brokers for failure to disclose defects; and telegraph companies [15] liable to individuals who failed to secure a contract due to the negligent transmission of a message.

We also emphasize that the holding of this case applies strictly to plaintiffs alleging purely economic loss from an interruption in commerce caused by another's negligence. This opinion therefore does not encompass, and has no effect upon, our prior rulings regarding medical monitoring, negligent infliction of emotional distress cases, or nuisance law. *See Bower v. Westinghouse Elec. Corp.*, 206 W.Va. 133, 522 S.E.2d 424 (1999) (permitting medical monitoring in absence of present physical injury); *Stump v. Ashland, Inc.*, 201 W.Va. 541, 499 S.E.2d 41 (1997) (holding that plaintiffs did not have to actually witness injury being inflicted to recover for negligent infliction of emotional distress where plaintiffs were present at scene of injury-producing event); *Marlin v. Bill Rich Constr., Inc.*, 198 W.Va. 635, 482 S.E.2d 620 (1996) (finding that plaintiff is not required to prove physical injury in asserting claim for negligent infliction of emotional distress); *West v. Nat'l Mines Corp.*, 168 W.Va. 578, 285 S.E.2d 670 (1981) (finding entitlement to preliminary mandatory injunction requiring defendants to abate nuisance where coal truck travel on public road caused dust to settle on plaintiffs' house and surrounding property).

The resolution of this matter of restrictions on tort liability is ultimately a matter of "practical politics." *Palsgraf*, 162 N.E. at 103 (Andrews, J., dissenting). The "law arbitrarily declines to trace a series of events beyond a certain point." *Id.* In other words,

it is a question of public policy. The purely economic damages sought by a plaintiff may be indistinguishable in terms of societal entitlement from those damages incurred by the restaurant owner in the next block, the antique dealer in the next town, and all the ripple-effect "losses" experienced by each employer and each resident of every town and village surrounding the location of the initial act of negligence. In crafting a rule to address the issue of economic damages, we have attempted to avoid the expression of a judicial definition of duty which would permit the maintenance of a class action as a result of almost every car wreck and other inconvenience that results to our state's citizenry.

In determining questions of duty and extension of duty to particular plaintiffs, the court in *Stevenson* echoed widespread speculation concerning the ripple effects of a negligence claim based upon pure economic loss and observed:

> Cases might well occur where a manufacturer would be obliged to close down his factory because of the inability of his supplier due to a fire loss to make prompt deliveries; the power company with a contract to supply a factory with electricity would be deprived of the profit which it would have made if the operation of the factory had not been interrupted by reason of fire damage; a man who had a contract to paint a building may not be able to proceed with his work; a salesman who would have sold the products of the factory may be deprived of his commissions; the neighborhood restaurant which relies on the trade of the factory employees may suffer a substantial loss. The claims of workmen for loss of wages who were em-

223, 74 Cal.Rptr. 225, 449 P.2d 161 (1969) (attorney held liable for failing to inform plaintiff-beneficiary's mother of the testamentary consequences of a planned remarriage, reducing beneficiary's share of estate).

**14.** *See Galloway v. Cinello*, 188 W.Va. 266, 423 S.E.2d 875 (1992) (based upon West Virginia Code § 29C–6–101(1999), a notary public is liable to persons involved for all damages proximately caused by notary's official misconduct); *Biakanja v. Irving*, 49 Cal.2d 647, 320 P.2d 16 (1958) (notary public who failed to secure valid witnesses to signature of will held liable to in-

tended beneficiary who was deprived of proceeds of will).

**15.** *See Western Union Tel. Co. v. Tatum*, 35 Ala. App. 478, 49 So.2d 673 (1950), *cert. denied*, 35 Ala.App. 478, 49 So.2d 673 (1950) (telegraph company could be held liable for delayed delivery of telegram containing a contract offer, thereby causing plaintiff to not obtain a contract); *Bluefield Milling Co. v. Western Union Tel. Co.*, 104 W.Va. 150, 139 S.E. 638 (1927) (proof of an unreasonable delay in the transmission of message creates a presumption of negligence on part of telegraph company).

ployed in such a factory and cannot continue to work there because of a fire, represent only a small fraction of the claims which would arise if recovery is allowed in this class of cases.

73 N.E.2d at 203–04.

In an endeavor to focus upon the rights of other innocent parties not typically considered, a commentator reconstructs the *Stevenson* paradigm, as follows:

Cases might well occur where a manufacturer would be obliged to close down his factory [and the manufacturer's employees would be obliged to spend days idle and without income] because of the inability of [the manufacturer's] supplier due to a fire loss to make prompt deliveries; the [employees of a] power company with a contract to supply a factory with electricity would be deprived of [their income] which [they] would have made if the operations of the factory had not been interrupted by reason of fire damage; a [person] who had a contract to paint [the worker's house] may not be able to proceed with [the] work; a [travel agent] who would have sold [the workers vacation packages] may be deprived of [her] commissions; the [teen-age gardener, the grocer's delivery person, the piano teacher, and the weekly housekeeper who serviced the worker's home and family] may [each] suffer a substantial loss.

Silverstein, Eileen, *On Recovery in Tort for Pure Economic Loss*, 32 U.Mich.J.L.Ref 403, 437 (1999).

■ Tort law is essentially a recognition of limitations expressing finite boundaries of recovery. Using the absurdity of these chain-of-reaction but purely logical examples, courts and commentators have expressed disdain for limitless liability and have also cautioned against the potential injustices which might result. This Court's obligation is to draw a line beyond which the law will not extend its protection in tort, and to declare, as a matter of law, that no duty exists beyond that court-created line. It is not a matter of protection of a certain class of defendants; nor is it a matter of championing the causes of a certain class of plaintiffs. It is a question of public policy. Each segment of society will suffer injustice, whether situated as plaintiff or defendant, if there are no finite boundaries to liability and no confines within which the rights of plaintiffs and defendants can be determined. We accept the wise admonition expressed over a century ago, in language both simple and eloquent, proven by the passage of time and the lessons of experience: "There would be no bounds to actions and litigious intricacies, if the ill effects of the negligences of men could be followed down the chain of results to the final effect." *Kahl*, 37 N.J.L. at 8.

Certified Question Answered.

Justice STARCHER concurs and files a concurring Opinion in which Justice McGRAW joins.

STARCHER, Justice, concurring.

(Filed Jan. 16, 2001)

The majority opinion demonstrates a classic struggle in the development of the common law: the battle between crafting remedies for people or businesses that are injured—even people or businesses injured in a purely economic sense—as a direct and proximate cause of a tortfeasor's carelessness, and protecting litigants from random, unpredictable liability without limit.

I applaud the majority opinion's bold step forward, and its recognition that a tortfeasor may owe a certain, clearly foreseeable party a duty of due care to avoid causing "an interruption in commerce" which results in purely economic loss. I write separately to emphasize that this Court is not in a position to predict every situation where a tortfeasor's actions may have an adverse effect on a party's economic interests, a party with a "sufficiently close nexus or relationship" to the tortfeasor such that the tortfeasor's actions may form the basis for liability. In applying the Court's ruling to such situations in the future, circuit courts must use the existing concepts of legal duty, breach of that duty, and proximate causation to allow plaintiffs a remedy for their economic losses, while protecting defendants from tort liability almost without limit.

In the common law, it is widely recognized that the concept of "duty" is a flexible principle that is dependent upon circumstances.

As we stated over a century ago, "[n]egligence is the violation of the duty of taking care under the given circumstances. It is not absolute, but is always relative to some circumstances of time, place, manner or person." Syllabus Point 1, *Dicken v. Liverpool Salt & Coal Co.*, 41 W.Va. 511, 23 S.E. 582 (1895). We established a broad test for circuit courts to use in determining whether a defendant owed a plaintiff a duty in Syllabus Point 3 of *Sewell v. Gregory*, 179 W.Va. 585, 371 S.E.2d 82 (1988) where we stated:

> The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?

The fundamental reasoning behind this test is that a defendant's "liability to make reparation for an injury, by negligence, is founded upon an original moral duty, enjoined upon every person, so to conduct himself, or exercise his own rights, as not to injure another." Syllabus Point 8, *Blaine v. Chesapeake & O.R.R. Co.*, 9 W.Va. 252 (1876).

The defendants in the instant case argued that *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) and its progeny form the basis for a black-letter rule of law regarding a defendant's duty that is absolute: no plaintiff may recover for purely economic losses caused by the defendant in the absence of proof of a physical injury or property damage. Phrased another way, a defendant can arbitrarily wreak economic havoc and impose severe economic losses upon another party with impunity, so long as that other party isn't physically injured or doesn't sustain property damage. The defendants insist that we are bound to apply this unchangeable common law "rule" in this case. As the majority opinion makes clear, this Court disagrees with this proposition.

Commentators [1] point to the numerous instances where plaintiffs have—contrary to *Robins Dry Dock* and its progeny—been allowed to recover for purely economic losses in the absence of proof of a physical injury or property damage. The majority opinion lists numerous exceptions to the "absolute" rule suggested by the defendants, where courts have permitted plaintiffs to recover economic losses proximately caused by a tortfeasor's carelessness, all in the absence of physical injury or property damage. *See supra*, 208 W.Va. at 500–01 fn. 8–15, 541 S.E.2d at 590–91 fn. 8–15. As one court pointedly stated in rejecting notions of the existence of an unchanging, absolute common law rule, "[t]hese exceptions expose the hopeless artificiality of the per se rule against recovery for purely economic losses." *People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 N.J. 246, 261, 495 A.2d 107, 115 (1985).

When courts have resisted allowing plaintiffs to recover for negligently caused, but purely economic, losses, the courts have expressed concern about the judicial system

---

1. *See, e.g.*, Eileen Silverstein, "On Recovery In Tort for Pure Economic Loss," 32 U.Mich. J.L.Ref. 403 (1999); Herbert Bernstein, "Civil Liability for Pure Economic Loss Under American Tort Law," 46 Am.J.Comp.L. 111 (1998); Matthew S. Steffey, "Negligence, Contract, and Architects' Liability for Economic Loss," 82 Ky. L.J. 659 (1994); Michael D. Lieder, "Constructing a New Action for Negligent Infliction of Economic Loss: Building on Cardozo and Coase," 66 Wash.L.Rev. 937 (1991); Pegeen Mulhern, "Marine Pollution, Fishers, and the Pillars of the Land: A Tort Recovery Standard for Pure Economic Losses," 18 B.C.Env.Aff.L.Rev. 85 (1990); Ann O'Brien, "Limited Recovery Rule as a Dam: Preventing a Flood of Litigation for Negligent Infliction of Pure Economic Loss," 31 Ariz. L.Rev. 959 (1989); Kelly M. Hnatt, "Purely Economic Loss: A Standard for Recovery," 73 Iowa L.Rev. 1181 (1988); Robert L. Rabin, "Tort Recovery for Negligently Inflicted Economic Loss: A Reassessment," 37 Stan.L.Rev. 1513 (1985); Comment, "Negligent Interference with Contract: Knowledge As a Standard for Recovery," 63 Va.L.Rev. 813 (1977); Case Note, "Torts—Interference with Business or Occupation—Commercial Fishermen Can Recover Profits Lost as a Result of Negligently Caused Oil Spill," 88 Harv. L.Rev. 444 (1974); Harvey, "Economic Losses and Negligence, the Search for a Just Solution," 50 Can.Bar.Rev. 580 (1972); Roger B. Godwin, "Negligent Interference with Economic Expectancy: The Case for Recovery," 16 Stan.L.Rev. 664 (1964); Comment, "Foreseeability of Third Party Economic Injuries—A Problem in Analysis," 20 U.Chi.L.Rev. 283 (1953). For an early article suggesting the need for reassessing the "no-liability" approach, *see* Charles E. Carpenter, "Interference with Contractual Relations," 41 Harv.L.Rev.728 (1928).

being subjected to "administrative overload—the opening of the ubiquitous 'floodgates' to massive litigation." Ann O'Brien, "Limited Recovery Rule as a Dam: Preventing a Flood of Litigation for Negligent Infliction of Pure Economic Loss," 31 Ariz.L.Rev. 959, 966 (1989).

Commentators, however, point out that courts have allowed the grounds of liability to expand in every other area of tort law "despite the now commonplace awards of huge, unknowable sums in claims involving physical

2. One commentator states:

A favorite illustration of the need to limit liability by not compensating pure economic injury is Judge Kaufman's 1968 hypothetical [from *Kinsman Transit Co. v. City of Buffalo*, 388 F.2d 821, 825 n. 8 (2d Cir.1968)] of the unlucky motorist whose inadvertence causes an accident that shuts down the Brooklyn Battery Tunnel during rush hour:

A driver who negligently caused such an accident would certainly be held accountable to those physically injured in the crash. But we doubt that damages would be recoverable against the negligent driver in favor of truckers or contract carriers who suffered provable losses because of the delay or to the wage earner who was forced to "clock in" an hour late. And yet it was surely foreseeable that among the many [thousands] who would be delayed would be truckers and wage earners.

Many readers may find themselves mentally nodding in agreement with Judge Kaufman. As described, liability to thousands, none of whom suffered physical injury, for mere inadvertence may look disproportionate, perhaps ruinous. But let us investigate this intuitive response. First, as compared to awards for pain and suffering, the loss from economic injury is provable, not subjective or speculative. And even if delay costs 3000 motorists an average of $500 each (a generous assumption), *the negligent driver's liability looks to be about* $1.5 million, a significant sum, but hardly pauperizing in a world of multi-million dollar awards to one or two parties seriously injured in traffic accidents. Also noteworthy is the grouping of truckers and contract carriers with wage earners as equally undeserving claimants. The truckers and contract carriers are likely to be insured against losses occasioned by delays, whereas wage earners will not be. Perhaps eligibility for economic loss should exclude professional drivers and carriers in the course of their business, just as public safety officials cannot recover for negligently caused physical harm incurred while performing their jobs. But why exempt the wage-earners? Even more curious is the absence of any specific reference in the hypothetical to liability for property damage occasioned by the acci-

injuries." Eileen Silverstein, "On Recovery in Tort for Pure Economic Loss," 32 U.Mich. J.L.Ref. 403, 409 (1999). "As compared to awards for pain and suffering, the loss from economic injury is provable, not subjective or speculative." *Id* at 423.[2] As one court stated in holding that a plaintiff should be allowed to recover for economic losses in the absence of personal injury or property damage:

The answer to the allegation of unchecked liability is not the judicial obstruction of a

dent, the appropriately compensated being "those physically injured." Certainly the car owner whose automobile, though not involved in the primary accident, suffers $5000 damages attributable to the negligently caused crash will receive compensation for repairs and consequent economic harm. Similarly, if the negligent motorist caused minor physical damage to 3000 vehicles, delaying each driver an hour, in principle all drivers could recover for their proven economic losses as consequential damages *from injury to their property*. Why should the fortuity of minor harm to property entitle these drivers to recover for economic loss? And what if two tennis stars on their way to compete in the United States Open are involved in this auto accident, one athlete suffering a minor wrist sprain while the other endures only a delay that results in a forfeited match? For both tennis players, the consequences that matter are identical; athletes with a chance at titles are denied a singular opportunity to prove themselves, losing rankings, prize money, and endorsements. But only the athlete with the sprained wrist has a compensable injury and the opportunity to claim consequential economic damages.

On the other hand, viewed through the lens of pragmatism, how likely is it that many wage earners docked one hour's pay (or a class of wage earners) will engage lawyers to recover the lost earnings from the negligent driver? When the unusual claim for pure economic loss occurs, ought not the courts face the question of when "the link has become too tenuous—that what is claimed to be consequence is only fortuity"? And the hypothetical ignores third-party insurance and the benefit of spreading the risk among motorists, any one of whom could be the careless injurer or the unlucky injured. Thus, on close analysis the intuitive appeal of categorical denial of recovery for pure economic loss in order to forestall unacceptably widespread liability disappears. There may be instances of potentially ruinous liability but those instances do not serve as the foundation for the general rule prohibiting recovery for economic loss.

Eileen Silverstein, "On Recovery in Tort for Pure Economic Loss," 32 U.Mich.J.L.Ref. 403, 422–425 (1999) (footnotes omitted).

fairly grounded claim for redress. Rather, it must be a more sedulous application of traditional concepts of duty and proximate causation to the facts of each case.

It is understandable that courts, fearing that if even one deserving plaintiff suffering purely economic loss were allowed to recover, all such plaintiffs could recover, have anchored their rulings to the physical harm requirement. While the rationale is understandable, it supports only a limitation on, not a denial of, liability. The physical harm requirement capriciously showers compensation along the path of physical destruction, regardless of the status or circumstances of individual claimants. Purely economic losses are borne by innocent victims, who may not be able to absorb their losses. In the end, the challenge is to fashion a rule that limits liability but permits adjudication of meritorious claims. The asserted inability to fix crystalline formulae for recovery on the differing facts of future cases simply does not justify the wholesale rejection of recovery in all cases.

*People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 N.J. at 254, 495 A.2d at 111.

Our law exists to provide remedies to those persons or entities who are injured, even in a purely economic sense, as a direct and proximate cause of a tortfeasor's carelessness. Courts should not obstruct fairly grounded claims seeking to redress an economic wrong, and should only shield tortfeasors from infinite liability through the "sedulous application of traditional concepts of duty and proximate causation to the facts of each case." *People Express,* 100 N.J. at 254, 495 A.2d at 111. Where an individual can show he has suffered an economic loss proximately caused by the carelessness of another, and can show a narrow, clearly foreseeable "special" relationship between himself and the alleged tortfeasor, then the tortfeasor should be held responsible for the results of his actions.

I do not, and cannot, endeavor to predict every situation where a tortfeasor's actions may have an adverse effect on a party's economic interests, and when under the Court's opinion those actions may form the basis for liability. I trust to the circuit courts the discretion to use the existing rule

of "legal duty, the breach of that duty, and damage as a proximate result," *Sewell v. Gregory,* 179 W.Va. at 587, 371 S.E.2d at 84, to allow the plaintiffs a remedy while protecting the defendants from "tort liability almost without limit." *Harris v. R.A. Martin, Inc.,* 204 W.Va. 397, 403, 513 S.E.2d 170, 176 (Maynard, J., dissenting).

The majority opinion deftly sets forth a basis for holding defendants responsible for their actions, while simultaneously emphasizing the need for a finite boundary on liability. But the majority opinion is based upon a limited record and a certified question. Because the existence of a defendant's duty is relative to the "circumstances of time, place, manner or person," Syllabus Point 1, *Dicken v. Liverpool Salt & Coal Co., supra,* the evaluation of whether a defendant in a particular case had such a duty of care is a question for the circuit courts to consider on a case-by-case basis.

I therefore respectfully concur. I am authorized to state that Justice McGRAW joins in this concurrence.